UNITED STATES of America,
Plaintiff–Appellee,

v.

Hernan Francisco PEREZ–TOSTA, Gustavo Javier Correa–Patino, Erasmo Perez–Aguilera, Luis Guillermo Rojas–Valdez, Defendants–Appellants.

No. 92–4781.

United States Court of Appeals,
Eleventh Circuit.

Nov. 8, 1994.

Benjamin S. Waxman, Weiner, Robbins, Tunkey, Ross, Amsel & Raben, P.A., Miami, FL, for Perez–Tosta.

Oscar Arroyave, Miami, FL, for Correa–Patino.

Peter Raben, Coconut Grove, FL, for Perez–Aguilera.

William D. Matthewman, Miami, FL, for Rojas–Valdez.

Mary V. King, Asst. U.S. Atty., Miami, FL, for appellee.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and YOUNG *, Senior District Judge.

COX, Circuit Judge:

Defendants Hernan Perez–Tosta (Tosta), Gustavo Correa–Patino (Correa), Erasmo Perez–Aguilera (Aguilera), and Luis Rojas–Valdez (Rojas) appeal convictions for conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 and, in Rojas's and Correa's cases, possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Because the prosecutor gave only a few minutes' pretrial notice, Aguilera challenges the district court's admission of prior bad acts evidence under Fed.R.Evid. 404(b). In addition, Aguilera, Tosta, and Rojas contend that the evidence was insufficient to support their convictions. All the appellants also raise other issues.

## I. BACKGROUND

For over a year before the arrests in this case, the Drug Enforcement Agency (DEA) conducted an undercover investigation targeting a suspected cocaine trafficker, Fernando Loaiza–Alzate (Loaiza). As part of the probe, DEA agent Joseph Giuffre offered Loaiza his services as a smuggler of shipments of Colombian cocaine from the Bahamas into South Florida. For one of these shipments, Giuffre was put in touch with Adelsis Grieco. Grieco and Giuffre planned for Grieco to have the cocaine flown from northern Colombia to the southeastern Bahamas, where the cocaine would be dropped for Giuffre's men to retrieve. After Giuffre had smuggled the cocaine into South Florida, the cocaine would be transferred to Grieco's men.

One of these transfers in Florida was to take place on July 20, 1990. Grieco's organization owned two pickup trucks equipped with concealed cargo compartments under the truckbed. Grieco was to turn the trucks over to Giuffre, who was to have the concealed compartments filled with cocaine. Giuffre would then have his people park the trucks at two southwest Miami locations that Grieco would code into Giuffre's beeper.

On July 18, 1990, Giuffre and Grieco met in a Kendall, Florida restaurant for the initial transfer of the trucks. Grieco explained the pickups' hidden compartments to Giuffre as the two of them circled the parking lot in Giuffre's car. After Grieco had told Giuffre where the trucks were, Giuffre stopped the car, and Grieco rolled down his window and whistled. Tosta appeared with an envelope containing one of the trucks' keys, registration, and insurance papers. Tosta and

---

* Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting · by designation.

Grieco exchanged a few words in Spanish and left together in Grieco's car.

On July 20, 1990, the day planned for the transfer, Tosta and Aguilera arrived at Grieco's house at 10:20 a.m. in a LeBaron rented in Aguilera's name. Grieco took the wheel, and for the next hour and a half to two hours, he drove erratically around the neighborhood and up and down U.S. 1, pulling into driveways and pulling directly out again, making U-turns, and even coming to a full stop in moving traffic on U.S. 1. Agents identified this erratic driving as countersurveillance, a ploy for Grieco to determine if he was being followed. Meanwhile, around 11:00, DEA agents parked the pickups, each carrying seventy kilograms of cocaine, in two designated shopping center parking lots on U.S. 1. Grieco's erratic route took him repeatedly past the lots where the trucks were parked.

A few minutes after DEA agents had put the cocaine-laden trucks in the lots, Rojas and Victor Manuel Estrada–Correa[1] arrived to drive the trucks to Grieco's storage sites. Rojas was led by a small brown car to Correa's house. The testimony is in conflict as to what happened at Correa's house. DEA agents testified that Rojas drove the truck into the garage and closed the garage door, only to emerge a little while later, driving the same truck without the load of cocaine. Rojas testified that he never parked the truck in the garage, and that he was directed by a man to sit in Correa's living room. He did so until Correa (whom Rojas had never met) appeared, wet from the shower, and told Rojas to get out of the house. Rojas then left in the pickup he had arrived in.

As Rojas left, the DEA agents stopped the truck and arrested him. The agents immediately discovered that the cocaine was missing from the hidden compartments, and they returned to Correa's house. One agent discovered Correa with his body half out a window in the rear of the house. Correa went back in, and before agents could ram Correa's door in, Correa emerged from the open garage door in an attempt to flee. He was

arrested. Agents then entered the house and discovered the cocaine in a bedroom.

Meanwhile, Grieco had observed the DEA agents' unmarked cars following the LeBaron's erratic maneuvers, and he got out of the car at a gas station on U.S. 1. Aguilera took the wheel and continued the erratic driving for another half hour to forty-five minutes, when agents stopped the car and arrested both Aguilera and Tosta.

After the arrests, Grieco and Giuffre remained in contact for a few more weeks, but Grieco was never arrested and remained a fugitive at the time of trial.

Aguilera, Tosta, Correa, Rojas, Grieco, and Estrada–Correa were all charged with one count of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 and one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). At trial, most of the law enforcement personnel who surveilled the defendants testified as to what they saw on July 20. However, the Government did not call Agent John Shepard, the one agent who had direct visual contact with Correa's house while Rojas and Correa were inside.

In addition to the agents and officers, the Government called Luis Zaldivar, who was not a subject of this investigation, to testify that he had seen Aguilera on at least two prior occasions working for Grieco's organization. Only a few minutes before voir dire, the Government notified Aguilera's counsel that it intended to present this evidence under Fed.R.Crim.Evid. 404(b). Aguilera's counsel objected to the admission of the evidence with such short notice. At the hearing on the issue during trial, the district court concluded that because six days had elapsed between voir dire and the day the Government planned to call Zaldivar, the notice was in fact reasonable and the testimony therefore admissible.

The jury convicted Correa, Aguilera, Tosta, and Rojas of conspiracy to distribute cocaine. Correa and Rojas were also convicted of possession of cocaine with intent to distrib-

---

1. Estrada–Correa is not a party to this appeal. He was tried with the other defendants and found not guilty of possession of cocaine with intent to distribute. The jury could not reach a verdict on the conspiracy to distribute charge against him.

ute. All defendants moved for judgments of acquittal both at the close of the Government's evidence and at the close of all the evidence. At the close of the Government's evidence, the district court denied Rojas's and Correa's motions and reserved ruling on the others. At the close of all the evidence, the district judge denied all the motions.

At the sentencing hearings, the district court ruled that the defendants would be held liable for all seven hundred kilograms of cocaine that Grieco had planned to import through Giuffre. After adjustments, the court sentenced all four defendants to 235 months' imprisonment and five years' supervised release.

## II. ISSUES ON APPEAL

 Each of the four appellants raises a number of issues on appeal, and some of the issues are common to more than one appellant:[2]

(1) Aguilera, Rojas, and Tosta all challenge the district court's denial of their motions for acquittal, contending that the Government's evidence did not suffice to show they voluntarily participated in the conspiracy, or, in Rojas's case, to show that he knowingly possessed cocaine.

(2) Aguilera contends that the district court erred in admitting 404(b) evidence when Aguilera received notice of the Government's intent to offer the evidence only a few minutes before trial.

(3) Aguilera contends that the district court erroneously forbade him from cross-examining the Government's 404(b) witness on his knowledge of the sentencing guidelines.

(4) Rojas contends that he was denied effective assistance of counsel.

(5) Tosta and Rojas take issue with the district court's attribution of 700 kilograms of cocaine to them for sentencing purposes.

(6) Rojas argues that the district court erred in giving the jury a "deliberate ignorance" instruction.

## III. DISCUSSION

### A. Sufficiency of the Evidence

Three defendants, Tosta, Aguilera, and Rojas, contend that the district court improperly denied their motions for acquittal because the Government's evidence was insufficient to convict them. We find the evidence sufficient as to Aguilera and Rojas, but we hold that the evidence was insufficient to convict Tosta. After reviewing the relevant principles of law, we discuss each defendant in turn.

#### 1. *Standard of Review*

 We review the denial of a defendant's motion for acquittal de novo. *United States v. Mieres–Borges,* 919 F.2d 652, 656 (11th Cir.1990), *cert. denied,* 499 U.S. 980, 111 S.Ct. 1633, 113 L.Ed.2d 728 (1991); *United States v. Kelly,* 888 F.2d 732, 739 (11th Cir. 1989). In considering the sufficiency of the evidence, we draw all reasonable inferences in the Government's favor. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Keller,* 916 F.2d 628, 632 (11th Cir.1990), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991). For the evidence to support a conviction, it need not "exclude every reasonable hypothesis of innocence or

---

**2.** In addition to the issues listed in the text, Correa contends that the district court erred in refusing to give a "missing witness" instruction to the jury. Correa's argument concerns Agent John Shepard, whom the Government did not call and who was the only agent with a direct view of Correa's house. We hold that the court did not abuse its discretion in refusing to give such an instruction. Testimony at trial from agents in radio contact with Shepard showed that Shepard's testimony was likely to be unfavorable to Correa. In this circumstance, the "missing witness" instruction is inappropriate. *See United States v. Link,* 921 F.2d 1523, 1529

(11th Cir.), *cert. denied,* 500 U.S. 958, 111 S.Ct. 2273, 114 L.Ed.2d 724 (1991).

Correa also asserts that the district court violated his constitutional right to compulsory process by refusing to subpoena Agent Shepard. On the afternoon of the last day of trial, Correa requested a subpoena be issued to compel Shepard's appearance. The issuance of subpoenas under Fed.R.Crim.P. 17 is within the trial court's discretion, and timeliness is one of the factors the trial court may consider. *United States v. Rinchack,* 820 F.2d 1557, 1566 (11th Cir.1987). The district court was well within its discretion in refusing so untimely a request.

be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

### 2. *Law and Analysis*

■ To convict a defendant for conspiracy under 21 U.S.C. § 846, the evidence must show (1) that a conspiracy existed, (2) that the defendant knew of it, and (3) that the defendant, with knowledge, voluntarily joined it. *E.g., United States v. Sullivan,* 763 F.2d 1215, 1218 (11th Cir.1985). "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469 (quoting *U.S. v. Manton,* 107 F.2d 834, 839 (2d Cir.1939)); *see also United States v. Badolato,* 701 F.2d 915, 920 (11th Cir.1983). Guilt may exist even when the defendant plays only a minor role and does not know all the details of the conspiracy. *Id.*

■ The Government's case against Aguilera, Tosta, and Rojas was circumstantial. Thus, reasonable inferences, and not mere speculation, must support the jury's verdict. *United States v. Villegas,* 911 F.2d 623, 628 (11th Cir.1990), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991). The inference of participation from presence and association with conspirators alone does not suffice to convict. *United States v. Bell,* 833 F.2d 272, 275 (11th Cir. 1987), *cert. denied,* 486 U.S. 1013, 108 S.Ct. 1747, 100 L.Ed.2d 210 (1988). However, such an inference is permissible in evaluating the totality of the circumstances. *Id.*

### a. *Aguilera*

■ Aguilera argues that the Government failed to show that Aguilera voluntarily par-

ticipated in the conspiracy. The Government's case, according to Aguilera, showed mere association and flight. Aguilera understates the Government's evidence. The Government's case against Aguilera included testimony by law enforcement agents concerning the events on the day of his arrest, testimony by an informant about Aguilera's prior work for Grieco's organization, and documentary evidence associated with Aguilera that agents found in a search of Grieco's house.

The law enforcement agents testified for the Government that on the day of Aguilera's arrest, Aguilera arrived at Grieco's house at 10:20 a.m. in a car rented in Aguilera's name. Aguilera then rode with Grieco for nearly two hours of erratic driving that the agents considered to be countersurveillance. After Grieco observed that he was being followed and left the car, Aguilera continued to drive in the same erratic fashion until he was arrested.

The Government informant, Luis Zaldivar, testified that he had seen Aguilera performing menial tasks for Grieco's organization on at least two prior occasions.[3] In June or July of 1988, Zaldivar met Aguilera when Aguilera showed up at Zaldivar's boat to pick up a load of cocaine for Grieco. Zaldivar also transferred cocaine to Aguilera on another occasion in late 1988 or early 1989.

Finally, the Government introduced several documents associated with Aguilera that agents found in a filing cabinet in Grieco's house. The documents included a photocopy of Aguilera's driver's license, registration papers for a boat trailer in Aguilera's name, receipts from major purchases by Aguilera, certificates of title for a pair of jetskis owned by Aguilera, a boat registration and insurance papers showing Grieco and Aguilera as co-owners, business records for GPV International, a partnership in which Aguilera and Grieco were both partners, and a check writ-

---

**3.** At trial, the jury heard that Zaldivar was a former cocaine addict and a drug trafficker serving a sentence that he could reduce only by providing substantial assistance to the Government under Fed.R.Crim.P. 35. (Tr. at 1044, 1045, 1057.) Nonetheless, in reviewing the suffi-
ciency of the Government's evidence, we must resolve all credibility issues in favor of the Government and assume that the jury believed Zaldivar. *See United States v. Morales,* 868 F.2d 1562, 1574 (11th Cir.1989).

ten by Aguilera to a marina where Grieco and Aguilera's boat was docked.

This evidence supports a finding that Aguilera voluntarily participated in the conspiracy. The jury could reasonably have inferred from Aguilera's evasive driving after Grieco's exit that Aguilera was both aware of and voluntarily assisting the conspiracy. *See United States v. Morales,* 868 F.2d 1562, 1574 (11th Cir.1989) (including evasive driving by the defendant in a list of evidence showing involvement and active participation in a drug conspiracy). In particular, the fact that Aguilera's countersurveillance effectively led law enforcement agents astray from Grieco's trail could have supported an inference that Aguilera intentionally assisted Grieco in furthering the conspiracy. The jury could also have legitimately taken into account Aguilera's relationship with Grieco, as evidenced by the presence of documents associated with Aguilera in Grieco's house, to find that a conspiracy existed between them. *Cf. United States v. Cole,* 704 F.2d 554, 557 (11th Cir.1983) (alleged coconspirators' status as members of an "insular" motorcycle club a factor in finding a conspiracy). Finally, evidence of Aguilera's prior acts in support of Grieco's organization could legitimately have reinforced the jury's findings that Aguilera was not merely a bystander, but a knowing and voluntary participant in Grieco's organization. *Cf. United States v. Adams,* 799 F.2d 665, 672 (11th Cir.1986) (mere presence under suspicious circumstances coupled with a defendant's prior presence under similar circumstances enough to support conviction), *cert. denied sub nom. Morrell v. United States,* 481 U.S. 1070, 107 S.Ct. 2464, 95 L.Ed.2d 873 (1987). Thus, we affirm Agilera's conviction.

#### b. *Tosta*

■ Tosta also challenges the district court's denial of his motion for acquittal. Tosta argues that the Government's case would not support a finding beyond a reasonable doubt that Tosta knew of and voluntarily participated in the conspiracy. We agree.

The Government's evidence showed Tosta's involvement in two events. The first was on

July 18, 1990, when Grieco and Giuffre met to discuss the details of the July 20 cocaine transfer and for Grieco to turn over the trucks with concealed compartments. On July 18, Tosta appeared in response to Grieco's whistle and produced an open envelope containing the keys, registration, and insurance binder for one of the trucks. After handing over the envelope, Tosta and Grieco exchanged a few words in Spanish.[4] After Grieco and Giuffre concluded their meeting, Tosta and Grieco left together.

The second event was Grieco and Aguilera's countersurveillance on July 20, 1990, the day of Tosta's arrest. On that day, Tosta was present in the car with Grieco and Aguilera, and later just Aguilera, as Grieco and then Aguilera drove erratically over a course that took them back and forth past the sites where the cocaine-laden trucks were to be parked. Agents finally stopped the car and arrested Tosta and Aguilera. When one of the agents mentioned Tosta's actions on July 18, Tosta responded, "So, what's wrong with that?"

This case is very close, but the Government's case fatally lacks evidence that would support a finding beyond a reasonable doubt that Tosta voluntarily participated in the conspiracy. The sum of the inferences from the evidence is tantamount to that presented against Evasio Garcia in *United States v. Kelly,* 749 F.2d 1541 (11th Cir.), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985). In *Kelly,* the Government showed that Garcia had inspected a shrimpboat that was later used to import marijuana. *Id.* at 1548. The Government also showed that Garcia had been present at a meeting of key conspirators, and that Garcia had been sitting in a parked car near the house where the offloading crew had been preparing to go meet the shrimpboat with its load of contraband. *Id.* The *Kelly* court concluded that "all the record shows is that [Garcia] was an acquaintance of [a key conspirator]." *Id.*

Tosta's case is very similar to Garcia's. Like Garcia, Tosta performed a facially innocent act that furthered the conspiracy's use

---

**4.** The content of their conversation is not known because Agent Giuffre speaks no Spanish.

of one of its instrumentalities. Garcia inspected the shrimpboat, and Tosta was a runner for the keys and registration papers of a truck with concealed compartments. Furthermore, Tosta, like Garcia, was present in very suspicious circumstances. Garcia was sitting in a parked car where the smugglers were preparing to offload the marijuana; Tosta was riding in a countersurveillance vehicle near the site of a cocaine transfer.

The *Kelly* court concluded that "[a] reasonable jury could not conclude that Evasio Garcia was a co-conspirator in the importation and distribution schemes." *Id.* at 1549. Likewise, a reasonable jury could not ignore the doubts raised by the possibility that Tosta was an unwitting dupe in his sole action that furthered the conspiracy. *See United States v. Littrell,* 574 F.2d 828, 833 (5th Cir.1978). Furthermore, in the absence of any evidence that Tosta himself was on the lookout, a reasonable jury could not infer from Tosta's mere presence in Aguilera's rental car that Tosta was knowingly engaged in countersurveillance in furtherance of the conspiracy. *Cf. United States v. Villegas,* 911 F.2d 623, 628 (11th Cir.1990) (holding that the defendant's looking left and right in the vicinity of the defendant's brother's cocaine deal was not sufficient to show participation in the conspiracy).

Thus, we conclude that the Government's evidence was insufficient to convict Tosta of conspiracy to distribute cocaine. We therefore reverse Tosta's conviction.

#### c. *Rojas*

Rojas also challenges the district court's denial of his motion for acquittal on both the conspiracy and possession counts. Rojas argues that the evidence failed to show that he knowingly participated in the conspiracy and that he knowingly possessed cocaine. We disagree. We address the conspiracy conviction first, under the rules of law discussed above.

##### i. *Conspiracy*

In Rojas's case, the evidence was ample to show Rojas's knowing and voluntary participation in the conspiracy. The Government showed that Rojas picked up the truck with the contraband and drove the truck to Correa's house, following a small brown car. Government agents testified that Rojas drove the truck into Correa's garage and closed the garage door. A little while later, Rojas emerged from the garage in the truck emptied of its load of cocaine. While Rojas was in the house, no one entered or left. Government agents testified that shortly after Rojas left they discovered the cocaine in a bedroom of Correa's house.

Rojas testified in his defense that he never drove the truck into the garage, which was occupied by the car of a man whose name he did not know. He was told to stay in Correa's living room. He sat there alone for twenty-five or thirty minutes. Then Correa, whom Rojas did not know, came out of the shower and told him to leave. He never saw anyone else in the house except Correa.

Circumstantial evidence suffices to show participation in a conspiracy, *see Glasser,* 315 U.S. at 80, 62 S.Ct. at 469, and the evidence here clearly supports reasonable inferences of guilt, *see Villegas,* 911 F.2d at 628. A jury could reasonably have inferred from Rojas's collection of the cocaine-laden truck and following of the little brown car to Correa's house that Rojas was voluntarily performing the task for the conspiracy. The jury could also reasonably have inferred that the movement of seventy one-kilogram packages of cocaine from the truck to a bedroom in twenty-five minutes occurred with Rojas's knowing cooperation and assistance. Moreover, Rojas's implausible testimony itself could legitimately support an inference of guilt. *See United States v. Eley,* 723 F.2d 1522, 1525 (11th Cir.1984). Thus, we conclude that a reasonable jury could have found Rojas guilty beyond a reasonable doubt.

##### ii. *Possession*

To convict Rojas for possession of cocaine with intent to distribute, the Government must show both knowing possession and an intent to distribute. *United States v. Gardiner,* 955 F.2d 1492, 1495 (11th Cir. 1992). Constructive possession is sufficient, and intent to distribute is inferable from the quantity of cocaine. *Id.* The evidence was

also ample to convict Rojas on this charge. The Government showed that in twenty-five minutes seventy kilograms of cocaine moved from the truck that Rojas had driven to a bedroom in a house occupied only by Rojas and Correa. The jury could reasonably have inferred that Rojas was in possession of the cocaine during that twenty-five minutes. Moreover, the jury could have inferred an intent to distribute from the large quantity of cocaine. Thus, we conclude that the district court properly denied Rojas's motion for acquittal.

### B. 404(b) Reasonable Notice

#### 1. *Standard of Review*

We review district court rulings on the admissibility of evidence under an abuse of discretion standard. *United States v. Cardenas*, 895 F.2d 1338, 1342 (11th Cir. 1990).

#### 2. *Discussion*

Because the prosecutor failed to provide notice of the testimony until immediately before jury voir dire, Aguilera asserts that the district court abused its discretion in admitting prior bad acts testimony under Federal Rule of Evidence 404(b). A few minutes before jury selection on May 26, the prosecutor notified Aguilera's counsel that she intended to call two witnesses, Fernando Loaiza–Alzate and Luis Zaldivar, to testify about Aguilera's role in Grieco's earlier drug deals. Aguilera's counsel objected to the late notice. The district court did not immediately rule on its admissibility, asking instead for memoranda from the parties.

On June 1, Aguilera's counsel again raised the issue, and after a hearing the district court found that the prosecutor had not known of the potential 404(b) testimony until Friday, May 22, and that the prosecutor had notified the defense the next business day, May 26.[5] Because the prosecutor did not plan to call the witnesses until June 1, the court found that the defense had in fact had six days' notice. The court concluded that six days' notice was reasonable under the rule, and that the prosecution had therefore satisfied the requirement.

At the hearing, Aguilera called the DEA case agent, Joseph Giuffre, who testified that he had known of Loaiza's potential 404(b) testimony against Aguilera as early as the fall of 1990. However, Giuffre had not known of Zaldivar, or of Zaldivar's dealings with Grieco's organization, until the week before the trial, when the prosecutor learned of it. Ultimately, the prosecution did not call Loaiza, but did call Zaldivar. It is the admission of Zaldivar's testimony that Aguilera challenges.

Rule 404(b) was amended in 1991 to require the prosecution to provide reasonable notice in advance of trial of its intention to present 404(b) evidence, if the accused has requested the notice.[6] In this case, counsel for Aguilera had requested notice by adopting codefendant Tosta's motion for disclosure of extrinsic evidence, which the magistrate judge granted in September, 1990. Thus, the 404(b) testimony was admissible against Aguilera only if the prosecution's notice a few minutes before voir dire constituted "reasonable notice in advance of trial."[7] The construction of 404(b)'s reasonable notice re-

---

**5.** Monday, May 25, 1992 was Memorial Day.

**6.** The rule now reads:
 **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, **provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial**

**if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.**
 Fed.R.Evid. 404(b) (emphasis added).

**7.** Our analysis here does not concern whether the Government has shown the "good cause" that 404(b) requires for admission of 404(b) evidence during trial. *See* Fed.R.Evid. 404(b). The Government did give pretrial notice, however brief, and thus our inquiry is limited to whether this pretrial notice was reasonable. *See id.*

quirement is a question of first impression in this circuit.

In the particular circumstances of this case, we hold that the district court did not abuse its discretion in ruling that the prosecution had provided "reasonable notice" of Zaldivar's testimony. The policy behind 404(b) is "to reduce surprise and promote early resolution on the issue of admissibility." Fed.R.Evid. 404(b) Judiciary Committee note. The rule imposes no specific time limits beyond requiring reasonable pretrial notice, and the Committee notes explain that "what constitutes a reasonable ... disclosure will depend largely on the circumstances of each case." *Id.*

The Committee notes are silent as to what circumstances are relevant. To fill this gap, we analogize to other evidentiary notice provisions, such as those in the residual hearsay exceptions (Fed.R.Evid. 803(24) and 804(b)(5)), and to notice requirements imposed by discovery orders. We are mindful that the analogies cannot be taken too far, since the language of other notice requirements in the Federal Rules of Evidence is more specific than the "reasonable notice" required by 404(b). *See* Fed.R.Evid. 609(b), 803(24), 805(b)(5). Furthermore, discovery order notice requirements are not exactly parallel because the trial judge has more discretion in fashioning a remedy for discovery violations than for failure to give notice under 404(b). *See United States v. Hartley,* 678 F.2d 961, 977 (11th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *compare* Fed. R.Crim.P. 16(d)(2) *with* Fed.R.Evid. 404(b). Despite these differences, we find that three circumstances appearing in the analogous caselaw comport with the language and purpose of 404(b).

First, in evaluating the sufficiency of evidentiary notice, courts have considered the motivations and circumstances of the party presenting the evidence. *See, e.g., United States v. Euceda–Hernandez,* 768 F.2d 1307, 1313 (11th Cir.1985) (reversing a district court's suppression of evidence not disclosed by the prosecution under a discovery order, noting among other things that the prosecution's failure to notify was unintentional);

*United States v. Bailey,* 581 F.2d 341, 348 (3d Cir.1978) (affirming admission of hearsay despite a lack of notice under 804(b)(5) because the declarant became unavailable only after trial began, thus making it impossible for the proponent to give earlier notice); *United States v. Iaconetti,* 540 F.2d 574, 578 (2d Cir.1976) (admitting hearsay under 803(24) despite a lack of notice when the hearsay unexpectedly became necessary for effective rebuttal), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977). "Reasonable notice" under 404(b) should also take into account the circumstances of the prosecution's own discovery of the evidence. However, the notice requirement's purpose of "reduc[ing] surprise" is not served by allowing mere negligence to excuse a prosecutor's failure to give notice. To protect defendants from "trial by ambush," the Government should be charged with the knowledge of 404(b) evidence that a timely and reasonable preparation for trial would have revealed.

Second, courts have focused upon the prejudice suffered by the defendant because of the lack of notice. *See, e.g., United States v. Parker,* 749 F.2d 628, 633 (11th Cir.1984) (affirming the admission of hearsay under 803(24) despite a lack of notice because the opponent of the evidence had not shown he was harmed); *United States v. Leslie,* 542 F.2d 285, 291 (5th Cir.1976) (affirming the admission of hearsay under 803(24) although the record showed no notice, because the defendant was not harmed by the lack of notice); *United States v. Doe,* 860 F.2d 488, 492 (1st Cir.1988) (affirming admission of hearsay under 803(24) when defendants did not appear to be prejudiced by the lack of notice), *cert. denied sub nom. Andrades–Salinas v. United States,* 490 U.S. 1049, 109 S.Ct. 1961, 104 L.Ed.2d 430 (1989). Since the policy of 404(b)'s notice provision is to protect the defendant by reducing surprise, *see* Fed.R.Evid. 404(b) Judiciary Committee note, the possibility of prejudice to the defendant from a lack of opportunity to prepare should weigh heavily in the court's consideration.

Finally, a few courts have considered the importance of the evidence to the propo-

nent's case. *See, e.g., Euceda–Hernandez,* 768 F.2d at 1313 (reversing an order to suppress evidence not disclosed by the prosecutor under a discovery order, noting among other things that the suppressed evidence was "extremely important to the Government's case"); *United States v. Burkhalter,* 735 F.2d 1327, 1329 (11th Cir.1984) (reversing as too extreme a sanction an order effectively suppressing evidence not disclosed under a discovery order). As in the discovery cases, the court should take into account the significance of the evidence to the prosecution's case. The second sentence of rule 404(b) is a rule of inclusion, and 404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case.

▮ Thus, by analogy to other notice provisions, we can discern three factors the court should consider in determining the reasonableness of pretrial notice under 404(b):

(1) When the Government, through timely preparation for trial, could have learned of the availability of the witness;

(2) The extent of prejudice to the opponent of the evidence from a lack of time to prepare; and

(3) How significant the evidence is to the prosecution's case.

We now apply these factors to the circumstances of this case.

▮ First, the district court found that the prosecutor did not know of Zaldivar's potential testimony until the Friday before trial began.[8] The case agent testified that he did not know of Zaldivar before the prosecutor did. Although the Government's failure to timely prepare for a trial would not excuse the lack of notice, it is clear from the record that a reasonably timely preparation for trial would not have revealed Zaldivar's possible testimony before that time. Although Zaldi-

var had made a statement to the DEA as early as January 1992, Zaldivar was not part of the conspiracy in which the defendants were involved and that Agent Giuffre was investigating. Thus, it is not apparent how Giuffre would have learned that Zaldivar had made statements concerning Aguilera. In fact, Zaldivar's testimony came to the attention of the prosecutor only when Zaldivar himself telephoned her.

Second, Aguilera's counsel has been vague, both during trial and in this appeal, as to what measures he might have taken, given more time, to meet the evidence. At the district court hearing on the 404(b) evidence's admissibility six days after the prosecution had notified the defense of the 404(b) evidence, Aguilera's counsel proposed only to send out his investigator to check Zaldivar's stories. If even after six days Aguilera could point to no specific actions he might take given more preparation time, it was within the district court's discretion to conclude that Aguilera would not be prejudiced by having only six days' notice.[9]

Finally, the evidence was significant to the Government's case against Aguilera. The Government's other evidence was merely that Aguilera was present in the countersurveillance car, that Aguilera later drove the car, and that papers associated with Aguilera were in Grieco's house. Zaldivar's testimony to Aguilera's prior cocaine-related work for Grieco lent strong support to a finding that Aguilera was aware of and voluntarily participated in the conspiracy. Along with the other factors, this circumstance weighs in the Government's favor.

On the record in this case, all three considerations thus weigh somewhat in favor of finding that the Government's pretrial notice was reasonable. We therefore hold that the

---

8. The trial began the following Tuesday.

9. In cross-examination of Zaldivar, Aguilera's lawyer in fact brought out that Zaldivar was a cocaine and marijuana smuggler, that Zaldivar had lied to a Customs inspector, that he did not pay taxes on his drug profits, that his testimony was part of an effort to get out of prison sooner, that he had been granted use immunity, that Zaldivar had not mentioned Aguilera during his initial debriefing, that Zaldivar was a cocaine

addict, that he tested positive for marijuana when he was first incarcerated, that at the time of his arrest three state arrest warrants had been issued for him, that he had been arrested for burglary, and that Zaldivar could not remember who his last employer was. Thus, it seems likely that even if the district court erred in admitting the 404(b) evidence on such short notice, the error was harmless.

district court did not abuse its discretion in admitting the evidence.

## C. Other Issues

### 1. *Exclusion of Sentencing Cross–Examination*

 Aguilera contends that the district court's violation of his Sixth Amendment Confrontation Clause rights entitles him to a new trial. During cross-examination of Zaldivar, .the Government's 404(b) witness, Aguilera's counsel attempted to elicit Zaldivar's understanding of the sentencing benefits he would earn by testifying for the Government.[10] On the Government's objection, the court admonished Aguilera's counsel to "stay away from anything having to do with any sentencing." (Tr. at 1075.)

Aguilera argues that he was unable to expose Zaldivar's motive for testifying. He was thus effectively rendered unable to attack Zaldivar's credibility, in violation of his Sixth Amendment rights. *See Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). We disagree. Our reading of the transcript convinces us that Aguilera not only effectively impeached Zaldivar's credibility, but also impeached it repeatedly on the very issue of sentence reduction. (Tr. at 1065, 1074, 1078–79.) Aguilera's contention is thus meritless.

### 2. *Ineffective Assistance of Counsel*

 Rojas challenges his conviction on the ground that he was denied effective assistance of counsel in violation of his Sixth Amendment rights. It is settled law in this circuit that a claim of ineffective assistance of counsel cannot be considered on direct appeal if the claims were not first raised before the district court and if there has been. no opportunity to develop a record of evidence relevant to the merits of the claim. *See United States v. Hilliard,* 752 F.2d 578, 580 (11th Cir.1985); *United States v. Lopez,* 728 F.2d 1359, 1363 (11th Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984); *United States v. Griffin,* 699 F.2d 1102, 1107 (11th Cir.1983). Rojas did not raise ineffective assistance of counsel as a ground for his motion for new trial, and the record is not sufficiently developed to evaluate the merits of the claim. Hence, the claim is more appropriately raised in a proceeding under 28 U.S.C. § 2255. *See id.*

### 3. *Sentencing*

 Rojas also challenges his sentence.[11] In calculating Rojas's offense level, the district court attributed to Rojas 700 kilograms of cocaine, the total amount of the importation Grieco and Giuffre planned. *See* U.S.S.G. § 1B1.3(a)(1) (1991); *id.* § 2D1.1(c)(2). Rojas contends that seventy kilograms, the quantity hidden in the truck Rojas drove, was the appropriate amount.

The Guidelines provide that a member of the conspiracy is liable for all conduct of others in furtherance of the conspiracy that is reasonably foreseeable by the defendant. *Id.* § 1B1.3(a)(1). At Rojas's sentencing

---

**10.** The relevant transcript passage reads:

Q. Your initial sentence was reduced from 17.7 years to nine years, is that correct?
A. That is correct.
Q. And by testifying here today your [sic] hoping with this story to get another sentence reduction, isn't that correct?
 MS. KING [prosecutor]: Objection form of the objection [sic].
 THE COURT: Overruled.
 THE WITNESS: Yes, that is correct.

. . . . .

Q. How much of a reduction, sir, do you think you're going to get out of this case?
A. I don't know, sir.

. . . . .

Q. Sir, in federal court you serve about eighty-five percent of your sentence, do you not?

MS. KING: Objection, your Honor.

. . . . .

Q. So you're familiar with the guidelines?
 THE COURT: Sustained.

. . . . .

Q. Are you familiar with the Sentencing Guidelines?
 MS. KING: Objection, your Honor.
A. Yes, I am.
Q. Do you have an opinion as to how much—
 MS. KING: Objection, your Honor.
 THE COURT: Counsel, stay away from anything having to do with any sentencing.
(Tr. at 1073–75.)

**11.** Tosta makes a similar challenge, but our reversal of his conviction makes it unnecessary to address his contentions.

hearing, Rojas did not request an individualized finding of fact as to what quantity would have been reasonably foreseeable to him, and the district court did not make one. Under these circumstances, the district court is entitled to rely upon the factual statements in the presentencing report (PSI) without making an individualized finding. *See* Fed. R.Crim.P. 32(c)(3)(D). But Rojas's PSI is at best ambiguous. It conclusorily states that "the amount of cocaine involved in this offense is approximately 700 kilograms." On that basis, the PSI fixes the offense level at 40 because the offense involves at least 500, but less than 1500 kilograms. *See* U.S.S.G. § 2D1.1(a)(3), (c)(2) (1991). The PSI also states, however, that Rojas served as a "hired hand" and that it "is doubtful that the defendant realized the quantity of contraband he was transporting. . . ." It is unclear whether this latter statement refers to the contraband on Rojas's truck or to the contraband involved in the overall conspiracy. However construed, the statement casts doubt on the propriety of attributing 700 kilograms to Rojas.

Because we find the PSI ambiguous, we conclude that no factual finding supports the quantity of cocaine attributable to Rojas under the guidelines. We therefore vacate Rojas's sentence and remand for resentencing following a finding relative to the quantity of cocaine attributable to Rojas.[12]

12. The Government does not argue that there is a finding relative to the quantity of cocaine attributable to Rojas or that Rojas waived the objection by failing to object after sentencing. The Government's argument is rather that we should uphold the sentence because the record would support a finding attributing 700 kilograms to Rojas. We prefer that the district court resolve this factual dispute.

13. The court instructed the jury:
When knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if a defendant is aware of a high probability of its existence unless he actually believes that it does not exist.
So with respect to the issue of defendants Estrada and Rojas's knowledge in this case, if you find from all evidence beyond a reasonable doubt that a defendant believed that he possessed cocaine and deliberately and conscious-

### 4. *Jury Instructions*

#### a. *Standard of Review*

The district court has broad discretion in formulating a jury charge as long as the charge as a whole is a correct statement of the law. *United States v. Bent*, 707 F.2d 1190, 1195 (11th Cir.1983), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984). We will not reverse a conviction unless we find that issues of law were presented inaccurately or the charge improperly guided the jury in such a substantial way as to violate due process. *United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir.), *cert. denied*, 493 U.S. 997, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989).

#### b. *Discussion*

Rojas contends that the district court improperly gave the jury a "deliberate ignorance" instruction.[13] We agree. However, we find that the error was harmless. A "deliberate ignorance" instruction is appropriate when "the facts . . . support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir.1991) (quoting *United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir.1987)). "[A] district court should not instruct the jury on 'deliberate ignorance'

ly tried to avoid learning that there was cocaine and deliberately and consciously tried to avoid learning of its presence in order to be able to say, if he should be apprehended, that he did not know cocaine was on or about his person, you may treat such deliberate avoidance, if so found, of positive knowledge as the equivalent of knowledge.
In other words, you may find that a defendant acted knowingly if you find beyond a reasonable doubt either that the defendant actually knew that he possessed cocaine or, two, that he deliberately closed his eyes to what he had every reason to believe was the fact.
I must emphasize, however, that the requisite proof of knowledge on the part of the defendant cannot be established by merely demonstrating that he was negligent, careless or foolish.
(Tr. at 1774–75.)

when the relevant evidence points only to *actual knowledge,* rather than deliberate avoidance." *Id.* (emphasis in original).

In *Rivera,* the defendants were arrested while attempting to bring three false-bottomed suitcases into the country with cocaine in the false bottoms. *Id.* at 1565. In its analysis of the appropriateness of the instruction, the court pointed out that the defendants had not indicated in any way their awareness of the unusual construction of their suitcases and their avoidance of positive knowledge of the contents. *Id.* at 1572. Nor was there any evidence that the defendants had acquired their suitcases under suspicious circumstances, but that the defendants deliberately avoided confirming their suspicions. *Id.* Thus, to contend that the instruction was appropriate because the defendants should have known they were carrying cocaine "skate[d] dangerously close to [urging] a negligence standard." *Id.*

■ In Rojas's case, the evidence likewise pointed to actual knowledge rather than deliberate avoidance. The relevant evidence was that Rojas drove one of the cocaine-laden trucks to Correa's house and was present while seventy kilograms of cocaine were taken off the truck and placed in a bedroom of the house. The inference of knowledge based on this evidence is that Rojas, being present during such a large movement of cocaine, had to have been aware of it. No evidence suggests that Rojas strongly suspected cocaine but "purposely contrived" not to learn about it. *See id.* at 1572. Hence, giving the instruction was error.

■ However, as in *Rivera,* we find that the error was harmless. *Id.* at 1572-73. The Government's evidence, though circumstantial, very strongly supported a finding that Rojas knew of the cocaine. The jury could easily have based its verdict on a finding of actual knowledge, rather than deliberate ignorance. We therefore affirm Rojas's convictions.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the convictions of Correa, Rojas, and Aguilera. However, we REVERSE Tosta's conviction, and we VACATE Rojas's sentence and REMAND for resentencing.

AFFIRMED in part; REVERSED in part; VACATED and REMANDED in part.