[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 18, 2006
THOMAS K. KAHN
CLERK

No. 06-13078
Non-Argument Calendar

_____

D. C. Docket No. 05-00004-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES PATRICK DENSMORE,
a.k.a. Patrick Eugene Cooley,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(December 18, 2006)**

Before DUBINA, CARNES and HULL, Circuit Judges.

PER CURIAM:

James Patrick Densmore appeals his convictions and concurrent 66-month

sentences, imposed for (1) conspiring to possess a counterfeit security, commit mail fraud, commit wire fraud, and launder money, in violation of 18 U.S.C. § 371; (2) possession of a counterfeit security, in violation of 18 U.S.C. § 513(a); (3) mail fraud, in violation 18 U.S.C. § 1341; and (4) wire fraud, in violation of 18 U.S.C. § 1343. After review, we affirm.

## I. BACKGROUND

### A. Trial

Densmore and a co-defendant, Richard Smiley, were indicted by a grand jury. All of the charges related to a conspiracy to use two trucking companies to solicit and obtain investments through false pretenses. Smiley entered into a plea agreement and agreed to testify against Densmore at trial.

During the trial, Smiley testified that Densmore approached him and suggested that he start a trucking company. At Densmore's direction, Smiley incorporated the trucking company and made himself the president. Although Densmore had no official position, he and Smiley spent every day together furthering the trucking company. Densmore's job was to secure financing by finding people who wanted to buy trucks. Densmore and Smiley together decided how to use the money they obtained from investors.

Densmore and Smiley met with investors and told them that their money

2

would be used as part of a deal to sell trucks to Xerox Corporation and that their investment would be doubled. However, the money actually was used to pay off existing debts and as spending money for Densmore and Smiley. Smiley admitted that he knew that they were telling lies to investors and that there was no deal with Xerox.

Among the investors Densmore and Smiley targeted were Smiley's parents. Smiley's father then introduced them to some of his friends and family, who also invested. In all, from 2001 to 2003, Densmore and Smiley obtained $1,214,000 from investors. When disgruntled investors contacted Smiley demanding money, Smiley told them lies, at Densmore's instruction, to reassure them and make them go away.

Densmore also instructed Smiley on how to make large cash withdrawals from the bank without arousing attention from the IRS by stating that the money was for truck auctions. According to Smiley, he gave the money he withdrew to Densmore, who then gave him some of the cash for living expenses.

Smiley further testified that Densmore drew up several notes indicating that Smiley had loaned Densmore $350,000 and that Densmore had loaned Smiley $350,000. Smiley also signed a document drafted by Densmore releasing Densmore from liability. No loans were actually made. Instead, Smiley explained

3

that the notes were designed to keep others from taking the investment money they had obtained. Densmore also had Smiley prepare and sign several sworn documents falsely indicating that Densmore had had no part in "the borrowing, or repayment process" for the money obtained from some of the investors.

In addition to Smiley, two trucking company employees testified at Densmore's trial. Jackie Creamer testified that, when he was hired, Densmore described the business, the job responsibilities and the pay to him. According to Creamer, Densmore had the largest office, was the person who paid Creamer, told both Creamer and Smiley what to do and appeared to be the one running the company. Densmore also told Creamer he owned the trucking company. Creamer also testified that, when he went to the bank with Smiley and Densmore, Densmore would wait in the car and have someone else deposit or withdraw the money. Richard Ethridge, another company employee, testified that he was hired by Densmore and that, although Smiley had the title of CEO, Densmore was the "guy in charge."

Several of the defrauded investors testified at Densmore's trial, including Smiley's father, Gary Smiley. Gary Smiley testified that his son introduced Densmore to him as his partner. Smiley and Densmore asked him to invest in their trucking company, guaranteeing that the investment would be doubled and quickly

4

returned.  In return for investing, Gary Smiley had his son sign a promissory note, which Densmore signed as a witness.  Over the course of the offense, Gary Smiley met with Densmore in person approximately four times and spoke with him at least ten times on the telephone.

On one occasion, Gary Smiley asked his son and Densmore for some proof that he would be getting his money back.  Densmore told Gary Smiley he would fax a copy of a check to him.  Gary Smiley then received a fax copy of a $43 million check.  Densmore told Gary Smiley that he had to make a copy of the check and fax it to him because the lawyers did not want him to have the check yet.  Densmore also told Gary Smiley that his name was on the check because they wanted him to distribute the funds to the other investors and put the remainder in an escrow account.  Ted Threatt, a senior investigator with Wachovia Bank, testified that the $43 million check faxed to Gary Smiley appeared to be counterfeit because there were font differences and the routing and account numbers were incorrect.

At a subsequent meeting with Gary Smiley and his son, Densmore told Gary Smiley that his money from the Xerox deal would be coming soon and that they already were working on a new deal with Publix.  Gary Smiley and his wife were never repaid the money they invested.

Two other investors, Fred Dunn and Robert Ballew, testified that they invested in the trucking company and were never repaid. Their testimony demonstrated that Densmore's level of involvement was consistent with his involvement in Gary Smiley's investment. In addition, Ballew testified that he received a truck as collateral for his investment. However, when Densmore approached him for more money and Ballew refused, Smiley pulled out a gun and said that "if anybody ever jeopardized any part of this deal or anything to do with their company, that something would happen to them." A few days later, Densmore approached Ballew in a convenience store and told him that "there was nothing [Ballew] could do to him," because "[Densmore's] name's not on anything" and Ballew could not "prove anything." When two men came to reclaim the truck, they spoke on cell phones with Smiley and Densmore.

Another defrauded investor, John Hill, testified that Smiley sent him by mail a written loan request with a cover letter from an attorney. Smiley admitted sending the letter and testified that Densmore helped him compose the letter and contacted an attorney to obtain the cover letter. Hill testified that Smiley also sent him two e-mails assuring him that everything was going to be fine with his investment and that he would get his money back. Although Hill never had any contact with Densmore, Smiley told him that he had a partner and had discussions

6

with Hill about Densmore. Likewise, another defrauded investor, Thomas Cooper, stated that he had contact only with Smiley, but that Smiley indicated that he had a partner and repeatedly stated in a letter and e-mails that "we" were getting things together to get Cooper his money back.

Kristie Bishop testified at Densmore's trial that she and her husband spent time socially with Densmore and his wife. According to Bishop, Densmore was a big spender who paid for things in cash. A forensic auditor testified about the close proximity between the withdrawals from the trucking company's bank account and several large purchases by Densmore. These purchases included over $10,000 in jewelry, a $250,000 house and a $34,000 Mercedes-Benz car.

At trial, the district court denied Densmore's motion for a judgment of acquittal. The jury found Densmore guilty on all counts. Following the verdict, Densmore moved for a new trial, arguing that the jury's verdict was contrary to the evidence. The district court denied Densmore's motion.

## B.    Sentencing

The presentence investigation report ("PSI") assigned Densmore a base offense level of 6, pursuant to U.S.S.G. § 2B1.1(a)(2). The PSI recommended a 16-level increase because Densmore's offenses involved more than $1,000,000, but less than $2,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(I). The PSI also

recommended a 2-level increase, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offenses involved more than ten but less than fifty victims. Finally, the PSI recommended a 2-level increase, pursuant to U.S.S.G. § 3C1.1, for obstruction of justice. With a total offense level of 26 and a criminal history category of I, the PSI recommended an advisory guidelines range of 63 to 78 months' imprisonment.

Prior to sentencing, Densmore objected to the enhancements for the number of victims and obstruction of justice. The government objected to the PSI's failure to assign Densmore an enhancement based on his role as a leader and/or organizer, pursuant to U.S.S.G. § 3B1.1(c). The government also argued that an upward departure was appropriate under U.S.S.G. § 4A1.3 because Densmore's criminal history did not adequately reflect his past criminal conduct.

At sentencing, Densmore and the government reiterated their objections to the PSI. In support of its motion for an upward departure, the government presented witness testimony about Densmore's involvement in another similar truck-selling scheme.

The district court overruled all objections and adopted the guidelines calculations in the PSI and PSI Addendum. The district court also found no reason to depart from the advisory guidelines range and sentenced Densmore to concurrent terms of 66 months' imprisonment on each count. The district court

ordered Densmore to pay restitution of $1,214,000, jointly and severally with his co-defendant, Smiley. The district court clarified that the government's motion for an upward departure, and the evidence presented to support it, had no effect on the sentence imposed. This appeal followed.

## II. DISCUSSION

### A.    Motions for Acquittal and for a New Trial

On appeal, Densmore argues that the district court erred by denying his motion for judgment of acquittal and denying his motion for a new trial. The district court did not err in denying these motions because there was more than sufficient evidence with regard to each count to allow a jury to find Densmore guilty beyond a reasonable doubt.[1] Specifically, the jury heard evidence from which it could have reasonably found that Densmore: (1) possessed a counterfeit check, which he faxed to Gary Smiley; (2) aided and abetted in mail and wire fraud by instructing Smiley on what to say to disgruntled investors, including in letters

---

[1]We review de novo the district court's denial of a motion for judgment of acquittal. United States v. Perez-Tosta, 36 F.3d 1552, 1556 (11th Cir. 1994). On review, we determine whether a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt. United States v. Pistone, 177 F.3d 957, 958 (11th Cir. 1999). We view the facts, and draw all reasonable inferences therefrom, in the light most favorable to the government. United States v. Hansen, 262 F.3d 1217, 1236 (11th Cir. 2001). We review a district court's denial of a motion for a new trial for abuse of discretion. United States v. Hernandez, 433 F.3d 1328, 1336 (11th Cir. 2005), cert. denied,126 S. Ct. 1635 (2006). In applying an abuse of discretion standard, we must affirm unless we find that the district court made a clear error of judgment or applied the wrong legal standard. United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004).

and e-mails to investors Cooper and Hill; (3) conspired with Smiley to possess the counterfeit check and commit the mail and wire fraud; and (4) conspired with Smiley to launder money when he instructed Smiley on how to make large cash withdrawals from the trucking company's bank account without arousing suspicion, accompanied Smiley to the bank when withdrawals were made and then took the money withdrawn by Smiley.

## B. Prosecutorial Misconduct

Densmore argues that the government impermissibly appealed to class prejudice when it presented testimony that Densmore was a "big spender" without being able to establish that the money spent was ill-gotten. Ordinarily, when we review a claim of prosecutorial misconduct, we consider (1) whether the challenged conduct is improper, and (2) if so, whether it prejudiced the defendant's substantial rights. United States v. Delgado, 56 F.3d 1357, 1368 (11th Cir. 1995). However, where, as here, the defendant did not raise this objection at trial, we review only for plain error "that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997).

Prosecutorial appeals to wealth and class bias can be "highly improper" and can deprive the defendant of a fair trial. See United States v. Socony-Vacuum Oil

10

Co., 310 U.S. 150, 239, 60 S. Ct. 811, 852 (1940). However, evidence of wealth or extravagant spending may be admissible when it is relevant to issues in the case. See United States v. Gonzalez, 940 F.2d 1413, 1423 (11th Cir. 1991) (explaining that the government is entitled to present evidence of sudden or unexplained wealth to prove that the income was received from an ongoing criminal enterprise and concluding that evidence of attempts to conceal the true source of such income also is admissible).

Here, the government introduced testimony regarding Densmore's purchases with large sums of cash and their timing to support an inference that those purchases were funded by the cash withdrawals from the trucking company's bank account. Thus, this evidence was relevant to the issue of whether Densmore's wealth was from an illegitimate source and supported an inference that Densmore committed the offenses charged. Therefore, the district court did not commit error, much less plain error, in admitting this evidence.

## C.    Victim Enhancement

Densmore contends the district court erred in applying a guidelines enhancement based on the existence of eleven victims. Specifically, Densmore argues that husbands and wives who invested in the trucking company should not

11

be counted separately.[2]

The Sentencing Guidelines provide for a 2-level enhancement if the offense involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). The commentary to § 2B1.1(b)(2) defines a victim as "any person who sustained any part of the actual loss . . . ." Id. at cmt. n.1. Based on the definition contained in the commentary, both the husband and the wife are victims under § 2B1.1(b)(2) when jointly held money is taken because both sustain a "part of the actual loss." Here, where husbands and wives were counted as separate victims, either the money invested in the trucking company was derived from jointly held accounts or the investment was made on behalf of both persons. Therefore, the district court correctly calculated the number of victims and properly applied the 2-level enhancement.

**D.     Obstruction of Justice Enhancement**

Finally, Densmore argues that the district court erred when it imposed a 2-level enhancement for obstruction of justice. Section 3C1.1 provides for a 2-level increase in the offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to the defendant's offense of conviction."

---

[2]We review a district court's application and interpretation of the guidelines de novo and its factual findings for clear error. United States v. Owens, 447 F.3d 1345, 1346 (11th Cir. 2006).

U.S.S.G. § 3C1.1.  The commentary to the guidelines lists "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" as an example of conduct to which § 3C1.1 would apply.  Id. at cmt. n.4(c).

The district court applied the obstruction-of-justice enhancement because, during discovery, Densmore produced a copy of a settlement agreement between Densmore and Donald Cook, indicating that Cook was to pay Densmore $1,400,000.  However, at trial, the government had introduced a certificate of the absence of a public record from the Fulton County Clerk indicating that the lawsuit reflected in the settlement agreement did not exist.  The probation officer who prepared the PSI interviewed Cook's wife (Cook was deceased), and she stated that she did not know of any such agreement, that her late husband would have been unable to enter into such an agreement and that Densmore was not listed in her late husband's Rolodex containing his personal and business contacts.  Based on this evidence, the district court found that Densmore had submitted a false document during discovery.

Substantial evidence supports the district court's finding that the settlement agreement Densmore submitted during discovery was false.  Furthermore, we have upheld a district court's application of a § 3C1.1 enhancement to the production of

a false document in discovery.  See <u>United States v. Callahan</u>, 981 F.2d 491, 496-97 (11th Cir. 1993).  Accordingly, the district court did not clearly err when it applied the 2-level enhancement for obstruction of justice.

For all these reasons, we affirm Densmore's convictions and sentences.

**AFFIRMED.**