[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-11216

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 18, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-20169-CR-PAS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARMANDO GARCIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 18, 2006)**

Before DUBINA, KRAVITCH and GIBSON,[*] Circuit Judges.

KRAVITCH, Circuit Judge:

_____

[*] Honorable John R. Gibson, United States Court of Appeals for the Eighth Circuit, sitting by designation.

On appeal from the defendant-appellant Armando Garcia's convictions via jury for conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(ii), and attempting to possess with intent to distribute 500 grams or more of cocaine, in violation 18 U.S.C. §§ 846, 841(b)(1)(B)(ii), we are asked to determine whether the district court erred in instructing the jury on the public authority defense. We conclude that we need not determine whether the instruction was erroneous because any alleged error was harmless. Therefore, we affirm Garcia's convictions.

## I. Background

According to the testimony at trial, a marriage of convenience between Armando Garcia and the federal government began in 1996 when Garcia began cooperating with the FBI as a way of obtaining a reduction of his unrelated ten-year sentence for conspiracy to import cocaine. While in prison, Garcia and his brother worked with FBI Special Agent Manuel Ortega in providing information on various drug transactions. Following his release from prison and the termination of his supervised release in October 2003, Garcia called Ortega offering to provide information about a drug smuggling operation involving approximately 1200 kilograms of cocaine to be shipped from Colombia to the United States via submarine. The marriage of convenience continued, but this

2

time, money was Garcia's motive.[1]  Soon thereafter, however, the relationship

turned sour.

The parties disagree about when and why the relationship disintegrated.

Ortega testified that shortly after speaking with Garcia in November 2003, he

called his colleague, FBI Special Agent Giraldo "Jerry" Bermudez, to set up a

meeting between Bermudez and Garcia.  According to Ortega, he informed Garcia

that he had to transfer the case to an agent who handled narcotics cases, which

Bermudez did, because Ortega exclusively handled terrorism-related cases.  Ortega

stated that Garcia called him several times between November 2003 and February

2004, urging him to organize the meeting, which he finally did in mid-February

2004.  Although Ortega agreed that he spoke with Garcia a few more times

following the meeting between Ortega, Bermudez, and Garcia, he stated that

Garcia never again provided him with information about any narcotics transactions

but that their conversations involved Garcia facilitating three-way calls between

Ortega and Garcia's former prison cellmate and Garcia requesting, and Ortega

providing, information about the immigration status of Garcia's friend from

_____

[1]  Although the government witnesses and Garcia had differing testimony on how much Garcia could have received for his cooperation, both sides agreed that money was Garcia's motive.

3

Germany.[2]

Bermudez testified that at his initial meeting with Garcia and Ortega, Garcia stated that he spoke with a man named Javier who wanted to transport 1200 kilograms of cocaine from Colombia to the United States via submarine. Because this initial meeting involved minimal discussion about the drug smuggling, Bermudez scheduled a meeting for February 18, 2004, which included a discussion of the history of Garcia's involvement with Javier and Javier's phone numbers in Colombia. Although Bermudez's testimony is inexact, Bermudez appears to have understood that the submarine would transport the cocaine to within approximately 100 miles of the coast of Florida and Garcia was responsible for transporting the cocaine to Florida. Furthermore, Bermudez testified that he informed Garcia that the FBI would pay Garcia's expenses associated with the drug smuggling operation. Finally, Bermudez stated that he asked Garcia if Garcia had any information about drugs already in Miami; Garcia allegedly said no.

According to Bermudez, he became aware that the relationship between the FBI and Garcia was in jeopardy when he met with DEA Agents Bern Reed and Paul Maxwell on March 1 to discuss one of his confidential sources. Reed and

_____

[2] The evidence showed that Ortega conducted computer checks on the German's immigration status on January 22, 2004 and March 3, 2004. Ortega testified that he also conducted a check in July 2003.

Maxwell informed Bermudez that they had identified Garcia as a target of their investigation into the purchase of twenty-five kilograms of cocaine. Reed testified that a DEA confidential informant had first made contact with Garcia on February 18, 2004 and met with Garcia later that day to discuss the possibility of Garcia purchasing twenty-five kilograms of cocaine from the confidential source. Garcia met the confidential source again on February 26, this time with Reed in an undercover capacity posing as the confidential source's drug dealing associate. According to Reed, Garcia informed Reed and the confidential source, Sandra, that he was working with a "money guy" and discussed the price with Reed, Sandra, or both on February 26 or 27.

Bermudez testified that he had already scheduled a meeting with Garcia for March 1 and that he and the DEA agents decided that they would determine how to proceed after the meeting. According to Bermudez, he and the DEA agents decided that if Garcia admitted his involvement in the deal with Sandra and Reed, the FBI and DEA would jointly pursue the "money guy." If not, Garcia would remain the primary target of the investigation. Bermudez decided not to mention the DEA investigation explicitly to Garcia because he did not want to jeopardize the investigation.

Later on March 1, Bermudez and his partner, FBI Special Agent Michael

Hoenigman, met with Garcia to present Garcia with paperwork that would begin the process of authorizing Garcia's involvement as a confidential source for the FBI and to read the rules and admonishments governing Garcia's involvement. Bermudez and Hoenigman both testified that Bermudez read the admonishments in their entirety to Garcia, gave examples, asked him if he understood, and asked if he had any questions. In particular, Bermudez read to Garcia Section F of the admonishments, which states: "You have not been authorized to engage in any criminal activity and could be prosecuted for any unauthorized criminal activity in which you have engaged or engage in the future. (This instruction should be provided to any source who is not authorized to engage in otherwise illegal activity)." Bermudez stated that Garcia became reserved when Bermudez read Section F, and Hoenigman stated that Garcia took and released a deep breath. Nevertheless, Garcia agreed that he told the agents he understood.

Bermudez then testified that after he completed the remainder of the admonishments, he returned to the prohibition in Section F because he knew about Garcia's involvement with Reed and Sandra. According to Bermudez, he emphasized to Garcia that the most important rule was that if Garcia met or negotiated with someone without the FBI's approval, the FBI could not protect Garcia and Garcia was on his own. Bermudez and Hoenigman testified that Garcia

6

affirmed his understanding and said "I know how the government works." Furthermore, when asked whether "anything was going on" or if he had heard from any of the subjects, Bermudez and Hoenigman testified that Garcia said no.

Following the March 1 meeting, Garcia remained the primary target of the DEA investigation. Through Sandra, the DEA attempted to schedule meetings with Garcia on March 1 and 2 to complete the twenty-five kilogram transaction. Each time, Garcia balked and blamed his hesitation on his inability to coordinate with his purchaser. After the March 2 meeting fell through, Sandra and Garcia did not communicate again until, according to the government, Garcia initiated contact on March 8. During a March 8 call, Garcia and Sandra agreed, at Garcia's suggestion, to complete a deal for two kilograms on March 9, and Garcia said that if his purchaser liked the cocaine, Garcia would return to purchase the remaining twenty-three kilograms. On March 9, 2004, Garcia met with Reed and Sandra to purchase the two kilograms of cocaine. Garcia entered Reed's truck where he saw two bags that contained packages that Garcia believed were filled with cocaine. In fact, the packages contained sham cocaine provided by the DEA as part of its sting operation. As Garcia prepared to transfer the packages from one bag to another, several DEA agents descended upon the truck and arrested him.

Following Garcia's arrest, he was brought for an interview at the DEA office

7

in Miami.  According to Bermudez, he waited in an adjacent room while other agents began questioning Garcia; Bermudez planned to enter the interviewing room if Garcia cited his cooperation with the FBI as the reason for his involvement in the drug transaction.  Reed testified that when Garcia stated that he was working with Bermudez, Bermudez was called into the interviewing room.  Reed stated that Garcia reacted to the sight of Bermudez by "kind of slump[ing] down in the chair" and "put[ting] his head down, shoulders in."

Bermudez testified that upon his entrance Garcia tried to explain Garcia's involvement in the transaction with Reed and Sandra as being part of the same case involving the drug smuggling from Colombia.  Bermudez alleged that Garcia then explained that he did the transaction with Reed and Sandra to enhance his credibility and pay expenses.  When Bermudez reminded Garcia that the FBI promised to pay for the expenses, Garcia allegedly said, "I really fucked up."[3] Following what Bermudez called his recommendation "to try to minimize how badly you messed up," Garcia waived his Miranda[4] rights and agreed to speak with the agents.

According to Reed, Garcia confessed that he planned to sell the two

---

[3] Reed testified that Garcia also "said something like, I made a mistake.  I should have told the FBI.  I am an idiot.  I am a jerk."  Maxwell testified that Garcia conceded that he did not tell the FBI about the drug deal with Reed and Sandra.

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

kilograms to a man named Premo, whom Garcia met through Premo's cousin, Gustavo. The plan was for Garcia to deliver the cocaine to Premo's house in Homestead where Premo would give Garcia $425,000 for the twenty-five kilograms, which Garcia planned to purchase from Reed and Sandra for $400,000.[5] Garcia also allegedly told the agents that he was supposed to confirm the pick-up with Javier, which the agents allowed Garcia to do. During the conversation between Javier and Garcia, Javier reminded Garcia that Garcia had to pay a commission of $500 per kilogram to his Colombian contacts. The government theorized that Garcia would have made a profit of $12,500 from the sale to Premo.

The agents then asked Garcia to schedule a meeting with Premo for delivery of the drugs. Per the agents' request, Garcia scheduled the meeting for that evening at a mall in Miami. Garcia and several agents went to the mall to prepare to arrest Premo. After waiting several hours, however, the agents became suspicious and called off the operation when they learned that Premo was a confidential informant for the Homestead Police Department.[6] Shortly thereafter,

---

[5] Reed testified that he, Sandra, and Garcia negotiated a price of $16,000 per kilogram. Garcia denied that he ever discussed the price with Reed or Sandra and asserted that his contacts in Colombia negotiated the price, which he said Javier told him would likely be $16,000 per kilogram.

[6] Rick Rivera of the Homestead Police Department testified that Premo was a confidential informant for, and Gustavo provided information to, the department. He further testified that the investigation into a target named Mandy began on January 30, 2004, and that at some point during the investigation, Gustavo introduced Premo to Mandy. Garcia conceded that

Garcia was indicted for conspiracy to possess five kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(A)(ii), and attempt to possess 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(B)(ii).

The government's case also included introduction of Garcia's cellular phone records and tapes of phone calls between Sandra and Garcia. Based on this evidence and Garcia's post-arrest statement, the government contended that Premo and Gustavo were involved throughout Garcia's negotiations with Sandra. Reed testified that during the February 26 meeting between Reed, Sandra, and Garcia, Garcia said "Let me call the money guy." Garcia's phone records show that he called Gustavo several times around the time he made that statement. Furthermore, the government alleged that the conversations between Sandra and Garcia on March 1 and 2 involved extensive discussions about whether the parties would meet to complete the deal and whether Garcia had the money. In response to Sandra's attempts to schedule a meeting on March 1 or 2, Garcia made statements such as "Let me call the guy" and "I'll talk to him right now." Garcia's phone records for those dates showed several successive calls to or from Sandra and Gustavo. Garcia's phone records also showed calls with Gustavo and Premo on

some people called him Mandy.

10

March 8 and before Garcia's arrest on March 9.

Garcia's Defense

According to Garcia, he did not realize that the relationship was in trouble until his post-arrest interview on March 9 when he suddenly became a scapegoat for the FBI and DEA's failed operation.[7] Garcia provided inconsistent testimony about whether Bermudez was already in the room when Garcia entered or whether Bermudez entered later. Either way, however, Garcia alleged that Bermudez immediately accused Garcia of failing to inform the FBI about the deal and making Bermudez "look like a fool." Garcia testified that he told Bermudez that he made a call to Bermudez as he was driving to meet Sandra and Reed but Bermudez did not answer. Garcia stated he told Bermudez that he decided that he would complete the transaction anyway and would call Bermudez and Ortega after the fact to arrange for pick-up of the remaining twenty-three kilograms of cocaine and the arrest of Reed and Sandra. Garcia also stated that Bermudez asked him to whom he was taking the drugs. Garcia testified that he initially told Bermudez that there

---

[7] Garcia testified that shortly after the post-arrest interview began he overheard Maxwell having a phone conversation in which Maxwell allegedly stated: "He doesn't have anything. He doesn't have any money. We don't have anything. We will fix it. We will see what we can do." Garcia also testified that he overheard a phone conversation after the failed deal with Premo in which Maxwell "was relating to the person on the phone that the whole operation was a flop, that they had met with another agency, that they didn't have anything except the subject that is being arrested. So we were basically asked – the only person that we have so far right now is in this operation."

was not a specific buyer, but later testified that he responded to the agents' promise to drop the case against him by telling the agents that he had a "very preliminary" buyer. At that point, Garcia attempted to set up the deal with Premo.

Garcia's defense at trial focused on Garcia's allegations that Ortega's involvement in the drug smuggling case continued after the initial meeting between Ortega, Bermudez, and Garcia and that he told Ortega about his dealings with Reed and Sandra. Garcia confirmed that he initially spoke with Ortega in November 2003 about a drug smuggling operation involving submarines from Colombia, but Garcia's testimony about the events that followed differed greatly from the testimony of the government's witnesses.

According to Garcia, the information he provided to Ortega was more detailed than the government admitted. Garcia testified that he told Ortega in November 2003 that his Colombian contact, Javier Meija,[8] planned to bring two submarines with 1200 kilograms of cocaine "close" to the coast of the United States. Garcia would remove the cocaine from the submarines, and the submarines would be loaded with weapons, which would travel to Colombian guerillas via

_____

[8] Garcia alleged that he told Ortega and Bermudez that Javier is related to the Meija twins, two well-known Colombian drug kingpins. Ortega and Bermudez agreed that they were familiar with the Meija twins' notoriety but denied that Garcia told them about Javier's alleged relation to the Meija twins.

Venezuela.[9] Garcia allegedly told Ortega that Javier planned to increase his drug smuggling into the United States if Garcia could handle more. Garcia testified that he and Ortega met twice in January 2004 to discuss the drug smuggling via submarine.

Garcia claimed that his involvement in what became the deal that ultimately led to his arrest began on February 3 when he received a call from Javier asking him to pick up drugs already in the Miami area. Garcia testified that he called Ortega on February 4 and informed Ortega of the newest proposal. According to Garcia, Ortega first mentioned Bermudez on February 5 when Ortega told Garcia that Ortega and Bermudez were going to work on the case together. At the end of the meeting involving Ortega, Bermudez, and Garcia, Ortega supposedly told Garcia that "Bermudez was going to work with him on the case, that the case actually involved drugs and weapons and both of them could be on the case."

According to the government, following the meeting involving Ortega, Bermudez, and Garcia, Ortega's involvement in the case ended. Garcia testified, however, that after speaking with Sandra on the phone for the first time on February 18, he called Ortega, who told him to "go and meet her, do nothing, and

---

[9] Ortega conceded that he could have worked on the case if the case involved weapons going to Colombian guerillas.

we will talk later about it."[10]  Garcia stated that he called Ortega after the meeting

with Sandra on February 18 and that his February 20 meeting with Ortega was to

provide information about the initial meeting with Sandra.  According to Garcia, he

told Ortega that he felt uncomfortable dealing with a woman, at which time Ortega

allegedly suggested that Garcia ask to change his contact, abandon the deal, or

complete the deal.  Garcia testified that Ortega preferred that he try to change the

contact.  Garcia further testified that his last contact with Ortega occurred on

February 20 and that because his discussions with Sandra had not progressed since

the February 20 meeting with Ortega, he felt that he did not have any information

to provide to Ortega.[11]  Garcia never alleged that he informed Ortega about the

meeting with Reed and Sandra on February 26, the negotiations between February

26 and March 9, or the March 9 deal.

Garcia further testified that in addition to the meeting with Ortega, he and

Bermudez met three more times: (1) immediately after the meeting that included

---

[10] Garcia testified that his conversations with Ortega about his German friend's immigration status ended before February, and the conversations and meetings he had with Ortega in February were to discuss his dealings with Reed and Sandra.

[11] On direct and cross examination, however, Garcia contradicted himself because he contended that Ortega and Bermudez told him that they were not interested in deals that would interfere with the submarine deal and that "you must try to get rid of them as best you can."

14

Ortega; (2) on February 17; and (3) on March 1.[12] Garcia stated that during the first two meetings with Bermudez, he mentioned Javier's desire to put Garcia in touch with a dealer who already had drugs in Miami. As Bermudez and Hoenigman testified, Garcia met with Bermudez again on March 1.[13] Garcia acknowledged that he understood Section F of the admonishments but testified that he assumed that he could complete the deal with Sandra and Reed because he was already authorized to work with Javier. Furthermore, contrary to Bermudez and Hoenigman, Garcia testified that when Bermudez asked whether "anything else is going on," he responded: "We're still working on Javier's case. I already talked to Agent Ortega about it." Garcia conceded that he did not know whether Ortega and Bermudez discussed Garcia and Ortega's alleged conversations about Sandra. Finally, although Garcia stated that he spoke with Bermudez about the possibility of becoming involved in deals involving drugs already in Miami, Garcia never testified that he gave Bermudez any information about the negotiations that led to his March 9 arrest.

As for Garcia's relationship with Premo and Gustavo, Garcia testified that

[12] Bermudez denied that he met with Garcia immediately after the initial meeting. The parties dispute whether the other meeting occurred on February 17 or 18. The resolution of these disputes is not relevant to our decision.

[13] Garcia disputed Bermudez's testimony, contending that Bermudez called him on March 1 to schedule the meeting and that they met shortly after the call. Garcia also asserted that the meeting was shorter than Hoenigman and Bermudez stated.

15

he met Premo through Gustavo but denied speaking with either about drug transactions. Garcia stated that Gustavo was a truck driver for the company for which Garcia was a dispatcher and that the numerous calls to Gustavo were to discuss work-related issues and to provide driving directions to Gustavo. According to Garcia, his phone calls with Premo involved discussions about Premo's friend who was looking for employment as a truck driver. Garcia contended that the proximity of many phone calls with Gustavo to phone calls with Sandra and of phone calls with Premo to the March 9 deal was purely coincidental.

Jury Instructions and the Alleged Error

Prior to trial, Garcia filed a notice of his intent to rely on a public authority defense, specifically that on the day of his arrest and for the preceding months, he was acting "in his capacity as a confidential informant for the Federal Bureau of Investigation, Special Agent Manuel Ortega." Garcia changed course at the charging conference, which was held immediately after the close of the government's case, arguing that the public authority instruction "would be confusing at this point and create additional requirements for us to prove," citing United States v. Ruiz, 59 F.3d 1151 (11th Cir. 1995) and United States v. Baptista-Rodriguez, 17 F.3d 1354 (11th Cir. 1994). Nevertheless, Garcia noted that his position that "he was acting as an informant for Agent Ortega, and then later

16

introduced to Agent Bermudez" remained the same. Instead of relying on the public authority defense, Garcia asserted that he would merely contend that he lacked the mens rea to commit the charged offenses. The government countered that the district court should issue the public authority instruction because the instruction would "give [the jury] the clear instructions that they need to be able to sort through the different arguments that defense counsel is making."

The district court overruled Garcia's objection, noting that:

> The authority and the reason why I need to give the public authority instruction as modified and simplified is because the defense is not that he just lacked the criminal intent, but the reason why he lacked the criminal intent was because he was engaging in conduct that he knew was criminal because it was sanctioned by his FBI handler. And that creates a separate factual issue, and I need to instruct the jury as to what to do with that fact.

Consequently, the district court instructed the jury on the public authority defense:

> The defendant's defense is that he was acting pursuant to public authority. If you find the defendant's criminal actions were undertaken in reasonable reliance on real government authority, then the defendant may not be convicted of violating the criminal statute because actions properly sanctioned by the government are not illegal. To establish this defense, the defendant must show first that the government entity involved did in fact sanction the defendant's otherwise criminal conduct; and, Second, that the defendant acted in reasonable reliance on such authority.

In compliance with Garcia's request, the district court also issued an

17

innocent intent/good faith jury instruction, which read:

> The word "willfully," as that term is used in the indictment or in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law.
>
> If you have reasonable doubt as to whether the defendant acted in good faith, sincerely believing that he was assisting the government to prevent the distribution of cocaine at the time of the offense charged, then he did not intentionally violate a known legal duty; that is, he did not act willfully, and that essential part of the offense would not be established.

During Garcia's closing argument, defense counsel stated: "When you are working for the government, your actions are not willfully breaking the law so long as you believe in good faith you are working for the government, you are not a criminal." Following the prosecutor's objection, the court told the jury that "[t]he instructions spell out, members of the jury, on page 16, the criteria that you are to take into consideration in evaluating the public authority defense."

The jury convicted Garcia of both counts. Garcia now appeals, challenging the jury instruction.

## II. Standard of Review

"Alleged errors in a jury instruction are reviewed by this court to determine whether the [district] court's charge, considered as a whole, sufficiently instructs the jury so that the jurors understand the issues involved and are not misled."

18

United States v. Shores, 966 F.2d 1383, 1386 (11th Cir. 1992) (internal quotations omitted).  We "will not reverse a conviction unless we find that issues of law were presented inaccurately or the charge improperly guided the jury in such a substantial way as to violate due process."  United States v. Perez-Tosta, 36 F.3d 1552, 1564 (11th Cir. 1994).  A jury instruction that improperly shifts the burden of proof to the defendant on an essential element of the offense is subject to harmless error review.  Franklin v. Francis, 720 F.2d 1206, 1212 (11th Cir. 1983).  An error is harmless only if the government demonstrates beyond a reasonable doubt that it did not contribute to the result.  United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005).

### III. Discussion

On appeal, Garcia argues that the instruction on the public authority defense impermissibly shifted the burden of proof from the government to him.  According to Garcia, the instruction erroneously invited the jury to consider whether Ortega and Bermudez had the authority to approve Garcia's purchase of cocaine from Reed and Sandra and whether Garcia's conduct was properly sanctioned.  Garcia contends that by doing so the instruction placed the burden on him to prove that the agents had the authority to approve his drug dealing and that Garcia acted in reasonable reliance on such authority.  Garcia asserts that his defense was simply

19

that he lacked the mens rea to commit the charged offenses because he believed his dealings with Reed and Sandra, about which he told Ortega, were part of his role as an informant.

Furthermore, Garcia cites Hall v. Kelso for the proposition that when intent is at issue and the evidence of the defendant's intent is not overwhelming, a jury instruction that shifts the burden of proof to the defendant is not harmless beyond a reasonable doubt. 892 F.2d 1541, 1546-47 (11th Cir. 1990). Our precedent requires us to presume that the jury followed all the instructions given by the district court. United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005). We conclude, however, that we need not determine whether the instruction was erroneous because the evidence of Garcia's guilt and intent were overwhelming.

First, we note that the FBI and DEA could have made the government's task easier if they had recorded Garcia's March 1 meeting with Bermudez and Hoenigman and his post-arrest interview. The primary focus of Garcia's defense was that he told Ortega about his dealings with Sandra and Reed thereby eliminating his criminal intent. When Ortega testified and denied that Garcia ever mentioned drugs already in Miami or his dealings with Sandra and Reed, the surest way the government could have proved Garcia's guilt was by presenting a tape of Garcia's own statements in which he did not refer to Ortega. One government

20

witness testified that they did not need to tape Garcia's statements because more than one agent was present. The FBI and DEA should have foreseen the swearing match that ensued, especially considering that Garcia already had betrayed them.

As noted earlier, this case involved a swearing match in which the parties found little common ground. The issue of credibility is a factual finding that is the province of the jury, however, and when Garcia decided to testify, he risked that the jury would determine that he lacked credibility and believe the government's case. United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) ("[T]he jury, hearing [the defendant's] words and seeing his demeanor, was entitled to disbelieve [his] testimony and, in fact, to believe the opposite of what [he] said."). Although the government presented the more credible version of the disputed events, we nevertheless rest our ruling on the clear inconsistencies in Garcia's testimony. Based on this evidence, we are convinced that the government has proved that any error was harmless beyond a reasonable doubt.

Garcia's testimony contained numerous inconsistencies and implausibilities that point to his guilt. First, Garcia testified to only two references he made to Ortega after his arrest. According to Garcia, shortly after his arrest but before his post-arrest interview, he asked "to call Agent Manuel Ortega and his partner Gerry." Then during the post-arrest interview, Garcia stated that he told Bermudez

21

that he planned to call Bermudez and Ortega after completing the deal with Reed and Sandra in order to prepare for the pick-up of the remaining cocaine and the arrest of Reed and Sandra. Notably, however, the government's and defense's testimony together show that Garcia did not tell the FBI or DEA about his alleged conversations with Ortega until June 1, 2004 when, at Garcia's request, Garcia, Garcia's lawyer, Bermudez, and Reed had a meeting at the federal detention center, where Garcia was incarcerated pending trial. Garcia failed to explain why he did not refer to Ortega's involvement during the post-arrest interview. Garcia's failure to do so calls into question the veracity of his testimony about Ortega's involvement.

Furthermore, Garcia testified that he last spoke with Ortega on February 20 and did not call Ortega after February 20 because the deal with Sandra had not progressed. Yet, after February 20, Garcia met with Reed and Sandra, had several negotiations with Sandra, arranged for a potential purchaser, and planned to purchase two kilograms of cocaine. Considering that Garcia's testimony suggests that he kept in close contact with Ortega when more minor changes occurred,[14] Garcia's explanation for failing to tell Ortega about anything that occurred after

---

[14] For example, Garcia testified that he called Ortega a short time after initially speaking with Javier on February 3 about a potential deal for drugs already in Miami and after meeting with Sandra on February 18. The events between February 20 and March 9 are as significant as or more significant than these two events.

February 20 lacked any credence. Furthermore, Garcia's statement that the case against Reed and Sandra had not progressed after February 20 was questionable. Even assuming that Garcia told Bermudez that he and Ortega discussed Javier's case, Garcia did not dispute that he did not inform any federal agents about anything that occurred after February 20 until his arrest on March 9.

Second, Garcia's testimony about his post-arrest interview showed another inconsistency in his defense. Garcia testified that he initially denied having a purchaser for the cocaine he bought from Reed and Sandra. Shortly thereafter, however, Garcia testified that he admitted to Bermudez during the post-arrest interview that he had a "very preliminary" buyer. This inconsistency alone raises concerns about Garcia's veracity, but the larger concern arises from Garcia's admission that he had a potential buyer, regardless of how fledgling the negotiations.

Garcia's need for a potential buyer was completely incongruous with his plan to call Ortega and Bermudez after obtaining the two kilograms of cocaine from Sandra and Reed. To the extent that Garcia alleged that he needed to complete the deal with Premo to pay for expenses, Garcia contradicted Bermudez, who testified that Garcia was informed that the FBI would pay all expenses.

23

Notably, Garcia never denied Bermudez's testimony.[15]

Furthermore, Garcia's contentions that Premo was a "very preliminary" buyer and that Gustavo was not involved in the proposed drug deal were implausible in light of the evidence. Garcia testified that he proposed the deal to Sandra for two kilograms in part because Premo "was asking me for some participation in whatever he could get." Yet, Garcia never testified to having had a conversation with Premo about drugs, denied that Gustavo acted as a conduit between Premo and Garcia, and denied that March 8 and pre-arrest March 9 phone calls with Premo involved any discussion about drugs. In light of this testimony, how Garcia could have known Premo's desire "for some participation in whatever he could get" was inexplicable.

The substance of the conversation between Garcia and Premo on March 9 and the length of time after Garcia began placing calls to and receiving calls from Gustavo and Sandra in quick succession also belied Garcia's arguments. During the post-arrest conversation, Garcia told Premo "I'm here with the girl" and she "brought the whole thing," and Premo was the first person to mention that the "whole thing" was twenty-five kilograms. Premo spoke far more knowledgeably

---

[15] Ortega and Bermudez both testified that they informed Garcia that "dope can't walk," which means that the government cannot use real drugs during sting operations. Garcia denied that the agents informed him of this rule, but based on the overwhelming evidence of several government witnesses, the jury obviously credited Ortega's and Bermudez's testimony.

than one would reasonably expect from a "very preliminary" buyer. Additionally, Premo asked Garcia whether Garcia had spoken to Chino "cause Chino told me, wait for me there because I'm going to call Mandy."[16] Premo's statement about Gustavo made sense only if Gustavo was involved in the drug-related discussions between Premo and Garcia.

Furthermore, the tape recorded conversations between Sandra and Garcia, the February 26 meeting between Reed, Sandra, and Garcia, and Garcia's phone records supported the government's argument that Gustavo was involved. Dating back to February 26, the recorded calls and meeting include several references to the "money guy" or other thinly veiled references to a purchaser. Then, on March 1 and 2, Garcia spoke with Sandra several times about the supplier of money and proceeded to trade calls with Sandra and Gustavo.[17] Garcia's claim that the order of calls was purely coincidental suspends common sense. Finally, Rick Rivera of the Homestead Police Department testified that Gustavo provided information to the police and Premo was a confidential informant during the police's undercover

---

[16] Garcia testified that Chino is Gustavo's nickname.

[17] For example, on March 2, Garcia made phone calls to or received phone calls from Sandra and Gustavo three times each within twenty-five minutes. During the first conversation with Sandra, Garcia said, "I'm getting to my friend's house. I'll talk to him right now." Garcia called Gustavo twelve minutes after making the first call. Garcia had more two phone calls with Gustavo and one more with Sandra before speaking with Sandra twenty-five minutes after the initial call and saying, "Give me – you have to give me like 15 or 20 minutes."

25

investigation against Garcia.

Third, Garcia provided inconsistent testimony regarding why he proceeded with the deal following his and Sandra's failure to schedule a meeting for March 2. According to Garcia, Sandra placed a three-way call involving Sandra, her contact in Colombia, and Garcia after Garcia continually devised excuses not to meet on March 1 and 2. The call ultimately involved a conversation between Sandra, Garcia, and Javier. Garcia testified that his goals during the three-way call were to cancel the deal and to save face. Garcia seemed to achieve both because Javier eventually agreed that the deal would not happen. Nevertheless, when Sandra called Garcia on March 8, he inexplicably decided that he "wasn't going to get rid of the whole thing so easily" and proceeded to propose that Sandra give him a sample.[18]

On cross examination, Garcia said that he completed the deal with Sandra because "she is insisting too much on the deal" and because Ortega told him "if you can't get rid of it, then you might as well take the step and organize it to go ahead and do the deal." Even accepting Garcia's testimony, his reliance on Ortega's statement was not convincing because he already had successfully ended the deal.

---

[18] To be as fair as possible to Garcia, we accept his contention that Sandra, and not he, reinitiated contact about the deal on March 8 after close to a week of silence regarding the deal.

Garcia's decision to accommodate Sandra's insistence was especially perplexing in the light of his other testimony. Garcia testified that "I didn't need to make anything small to [do] a larger deal. I had done larger deals already with them in the past" and "if you try to perform and you couldn't perform because something differently came into the picture, it doesn't affect your relationship." This testimony completely undermined Garcia's argument that he needed to complete the deal to retain his credibility with Javier. Garcia never explained why Sandra's desire to proceed with the deal trumped Javier's statement that the deal would not happen or Garcia's alleged desire to rid himself of the deal. Garcia's choice to continue the deal with Sandra can be explained only by his own desire to complete the deal.

Garcia admitted that he committed the acts involved in the two counts against him but disputed that he had the intent necessary to support a conviction because he believed that the FBI authorized his dealings with Reed and Sandra. As discussed above, however, unlike in Hall, the overwhelming evidence presented to the jury demonstrated that Garcia did not believe that the FBI sanctioned his conduct. Instead, the overwhelming evidence showed that Garcia had the necessary intent and acted on his own when dealing with Sandra and Reed. Even though we presume that the jury followed the instructions given by the district

27

court, we will not disturb the jury's verdict when the evidence of the defendant's intent is overwhelming and any alleged error in instructing the jury was harmless beyond a reasonable doubt. Cf. Paz, 405 F.3d at 948; Franklin, 720 F.2d at 1212. The government has met that burden here. Therefore, we reject Garcia's arguments and AFFIRM his convictions.

**AFFIRMED.**