[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 14, 2007
THOMAS K. KAHN
CLERK

No. 06-14496
Non-Argument Calendar

_____

D. C. Docket No. 05-60329-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CATHLEEN PATTERSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 14, 2007)**

Before MARCUS, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Cathleen Patterson appeals her convictions, imposed after a jury verdict, and 151-month sentence for conspiracy to possess with the intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and

attempt to possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. On appeal, Patterson raises three claims. First, she argues that the evidence did not support the district court's "deliberate avoidance" jury instruction. Second, she asserts the district court violated her Sixth Amendment rights during jury deliberations by improperly responding to the jury's question concerning the amount of heroin involved in the underlying offenses. Finally, Patterson challenges the district court's denial of a minor-role reduction at sentencing. After thorough review of the record and careful consideration of the parties' briefs, we affirm.

## I.

We review jury instructions de novo to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party. United States v. Chandler, 996 F.2d 1073, 1085 (11th Cir. 1993). "We will not reverse a conviction unless we find that issues of law were presented inaccurately or the charge improperly guided the jury in such a substantial way as to violate due process." United States v. Perez-Tosta, 36 F.3d 1552, 1564 (11th Cir. 1994).

Ordinarily we review a court's response to a jury question for an abuse of discretion. United States v. Wright, 392 F.3d 1269, 1279 (11th Cir. 2004). However, where, as here, an appellant presents different arguments on appeal

2

regarding why the district court's action was improper, our review is for plain error. Id. "To demonstrate plain error, [Patterson] must show: (1) an error; (2) that is plain; (3) that affects the defendant's substantial rights. If the defendant satisfies those three prongs, we may then employ our discretion to note that error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 1279-80 (internal citation and quotation marks omitted).

We review a district court's factual determination regarding whether a defendant is eligible for a reduction for role in the offense for clear error. United States v. De Varon, 175 F.3d 930, 934 (11th Cir. 1999) (en banc).

**II.**

The relevant facts are these. On December 22, 2005, Patterson and codefendants Lizza Cepeda, Maritza Rivera, and Rubby Rios, were charged in a multi-count indictment arising out of their involvement in smuggling heroin, while traveling on cruise ships, from Aruba to Port Everglades in Fort Lauderdale, Florida. Patterson was charged with the following crimes: (1) conspiring to possess with the intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count 1); and (2) attempting to possess with the intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count 5). After initially pleading

3

guilty, pursuant to a plea agreement, Patterson withdrew her plea and the case proceeded to a jury trial.

Prior to trial, the government submitted a motion and supporting memorandum of law requesting that the district court give a jury instruction on "deliberate ignorance" or "conscious avoidance." The government argued that because there was evidence of both actual knowledge and deliberate ignorance, it should be allowed to pursue both theories. The government also filed a Rule 404(b) Notice of Intent to offer extrinsic-act evidence.

During the trial, Special Agent Selwyn Smith, of the Immigration and Customs Enforcement ("ICE"), testified that in December 2005, he and other law enforcement agents boarded a cruise ship that had just arrived at Port Everglades after having traveled to Aruba. Their purpose was to perform random customs searches for illegal narcotics. During their search of the room occupied by Patterson's codefendants, Maritza Rivera and Lizza Cepeda, the agents discovered heroin hidden within various personal items, including perfume bottles, sandals, pants, and a CD case. Subsequent laboratory analysis revealed that the net weight of the heroin totaled 3.1 kilograms.

After Rivera and Cepeda were read their Miranda rights, they told the agents that a man named "Carlos," who lived in Colombia, had paid for their cruise to

4

Aruba where they obtained heroin from a man named "Mauricio." They had been promised $10,000 each for transporting the heroin into the United States. They both agreed to cooperate with law enforcement and to conduct a controlled delivery of the heroin in the South Florida area. Rivera subsequently placed calls to Carlos and Mauricio, indicating that she and Cepeda were fighting, and that they needed someone to pick up the drugs soon. Carlos told Rivera to call "La Mona," who later was identified as co-defendant Rios, to arrange for a pick-up.

Thereafter, an undercover agent, acting as Cepeda, called Rios, who said she would come to a Miami hotel and transport Cepeda and the drugs to the New York/New Jersey area, where Cepeda could secure her $10,000 payment for the smuggling job. Defendant Patterson drove Rios to the Miami hotel where the undercover agent had checked into a room. Patterson waited in her car in the parking lot while Rios met with the undercover agent in the hotel room. After entering the room, Rios inspected the contents of a bag the undercover officer gave to her. As part of the controlled buy, law enforcement had filled the bag with items containing fake heroin. As Rios pulled the items out of the bag, law enforcement entered the room and arrested her.

Patterson, who was still waiting in her car in the parking lot, also was arrested. In Patterson's car, the arresting officers discovered car rental documents,

suitcases with clothes, and a heat sealing machine. The rental documents indicated that Patterson had rented the car at Miami International Airport on the same day that the meeting at the hotel had been arranged. The agents also discovered a Western Union money transfer, in the amount of $920, payable to Patterson, and another, in the amount of $900, payable to Rios.

When she was arrested, Rios agreed to cooperate with law enforcement and admitted that she had taken three cruises, two of which entailed smuggling drugs into the United States. Agents learned from cruise-line records that Patterson had purchased the tickets for Rios's second cruise, and, immediately after the cruise, Patterson had rented a car for 10 days and drove it over 3,000 miles. Patterson also had purchased a hotel room in New Jersey three days after she rented the car, and 15 phone calls were made to "Consuelo's" phone number from the hotel room. The cruise-line records also indicated that in September 2005, Rios and Patterson went on another cruise to Aruba.

Special Agent Loni Forgash, the undercover ICE agent who posed as Cepeda during the investigation, testified that when she met with Rios in the hotel room prior to Rios's arrest, Rios told her not to be nervous because the most difficult part of the drug smuggling scheme -- getting through the Port -- was over. Rios also said that she and "this other lady [who] always traveled together have done

6

this in the past and . . . that on this trip they were actually going to get the money -- that we were going to get the money as soon as we arrived in New York."

The government also presented the testimony of codefendants Cepeda and Rio. Cepeda testified that during the December 2005 cruise, she and Rivera had attended a meeting with Mauricio at a McDonald's in Aruba, at which time he gave them bags containing the heroin. They were told that they would receive instructions from Carlos once the cruise was over, and that they were going to be paid between $8,000 and $10,000 for the trip.

Rios testified that she had known Patterson for almost three years, during which they had taken cruises in September 2004, April 2005, and September 2005. When Rios met Patterson, "Carlos" had asked her (Rios) to recruit other people to participate in the drug smuggling conspiracy. Patterson was an appealing recruit because of her looks and the fact that she was American and used a wheelchair, thus allowing her to enter the country without being searched. Rios characterized Patterson's wheelchair-bound status as a "big plus." Rios approached Patterson and asked her to come to Aruba to meet Mauricio. Patterson purchased the tickets for the September 2004 cruise with her credit card, and "Carlos" reimbursed her. When the two women arrived in Aruba, they met Mauricio at a McDonald's, and he took them to his apartment where he told them that on future trips, they would

7

receive several items from him, including perfumes, shoes, and cameras. Rios remembered Patterson asked Mauricio whether he would pay for lawyers if there was a problem.

After the initial meeting with Mauricio, Patterson agreed to the plan and told Rios that she was comfortable going on the April 2005 cruise because she was sick (and in a wheelchair), and, therefore, they would "always go first." Patterson made the travel arrangements, and, once in Aruba, they again met Mauricio at the McDonald's and went to his apartment where he gave them shoes, a purse, and perfumes, all of which contained drugs. Rios and Patterson put the items in bags and hung them from Patterson's wheelchair. When they went through customs at Port Everglades, they went to a special elevator and were not searched because Patterson was in a wheelchair. They then traveled to New Jersey where Rios delivered the drugs. The next day, "Consuelo" met Rios in the hotel lobby and paid her $20,000 to be split between herself and Patterson.

Rios described the third cruise that she and Patterson took in September 2005. Again, Patterson made the reservations for the trip and purchased the tickets through her travel agency. At another meeting at the McDonald's in Aruba, Mauricio gave them items, including perfumes and a CD player, that contained

drugs. During the ship's stop in Puerto Rico, Rios delivered the drugs to a man at a shopping center. They were each paid $13,000 for their smuggling services.

As for Rios's and Patterson's involvement in the December 2005 cruise taken by Cepeda and Rivera, Rios testified that in the afternoon of December 12, 2005, she was contacted from Colombia by "Carlos" who told her that she needed to rent a car and pick up Cepeda at a hotel in Miami and take her and some drugs to New York. Rios told Carlos that she did not have a credit card, and, therefore, she would need to speak to "Cathy," whom she trusted and with whom she previously had "done business." After the phone call, Rios contacted Patterson, who agreed to accompany Rios to pick up a woman and some drugs at a Miami hotel and transport them to "Consuelo" in New York. Rios told Patterson that Carlos would pay each of them $1500, plus $1000 for travel expenses, and that some of the money had been wired in advance from New York. While Rios was at Patterson's house, "Carlos" called again and told Rios to make sure there were five packages. Rios then spoke to either Cepeda or Maritza, and arranged to meet them at the Miami hotel the next morning.

Rios received another call from "Carlos" the next morning. He explained that Rios and Patterson would be transporting seven, as opposed to five, packages of heroin. When Patterson picked Rios up that morning, Rios informed Patterson

9

about the changed amount, and Patterson asked whether Carlos would pay them for the extra two packages. Rios assured Patterson that Carlos would pay them extra. Rios also testified that during a conversation with Patterson, after they were arrested at the Miami hotel, they had agreed to "stick together" and never talk about their previous trips.

Officer Tracy Land, of the Broward County Sheriff's Office, testified that he interviewed Patterson at the Miami hotel after her arrest, and, once the interview was over, he gave Patterson an opportunity to make changes to his written notes. According to her statement, which Officer Land read into the record, Patterson was driving Rios to New York because Rios did not have a credit card. Patterson admitted that she had a "general idea" that Rios was transporting drugs, and that Rios "possibly" had drugs in a pair of shoes she had bought in Aruba. Patterson also said that during one of their prior cruises, Rios had met with a man in Aruba. Patterson said that she thought the meeting "might be about a drug deal." Patterson also described a second cruise in which she believed that there "possibly w[ere] drugs" in a large bronze cologne bottle.

After the government rested, Patterson testified in her own defense. She claimed that at no point after she met Rios sometime in mid-2004 did Rios ever discuss the drug business. When Rios invited Patterson to accompany her on a

10

cruise shortly after they met, Patterson thought she had been invited only because Rios had no one else to go with her, and when Rios asked Patterson to make the arrangements and pay for the cruise because she did not have a credit card, Patterson agreed based on her understanding that Rios would reimburse her. Patterson also claimed that during her various cruises to Aruba, she had never met with anyone concerning drugs. Patterson said that she never agreed to help Rios smuggle drugs into the U.S. or to transport them from Florida to New York, and that Rios never paid her any money, except to reimburse her for travel expenses.

Patterson also gave her version of the events leading up to her arrest in December 2005. She had planned to take a food sealer to her sister in Gainesville when Rios asked her to go to New York. Rios told Patterson that they were going to take someone with them who did not have proper identification to buy a plane ticket, but Rios did not tell her that the person would be carrying drugs. Patterson rented the car later that night, and, after she picked Rios up the next morning, they drove to a hotel in Miami to pick up the other passenger. When they got to the hotel, Rios went inside while Patterson waited in the car.

Patterson testified that once she had been arrested and removed from her car, she began to feel extremely dizzy due to her diabetes and the fact that she had not eaten. She claimed she informed agents of this fact, but they took her to a hotel

room and began screaming at her about her involvement with the drugs. She could not remember what she said during her interview, and testified that she had been unable to read her statement because she did not have her glasses. She told the agents that she had been on previous trips with Rios, but she did not admit to having knowledge of any drugs. She also testified that she did not say anything to Rios in prison about trying to conceal information from the government.

During the government's rebuttal, Special Agent David Mitchell, of the Drug Enforcement Administration, testified that he was present when Patterson was arrested at the Miami hotel. After her arrest, the arresting officers allowed Patterson to sit in a chair and use the bathroom before taking her upstairs to a hotel room. Special Agent Mitchell did not witness anyone abusing Patterson, and he never heard her complain of pain or discomfort. Another special agent's testimony was consistent with Special Agent Mitchell's version of events.

After the close of evidence, Patterson objected to the proposed jury instruction on deliberate ignorance. The court overruled the objection without explanation. During closing arguments, Patterson urged that she should not be punished for being gullible and naive.

The district court's charge to the jury included the following jury instruction:

[W]ith respect to the issue of [Patterson's] knowledge in this case, if you find from all the evidence beyond a reasonable doubt that [Patterson] believed that she was at the hotel to pick up and transport a controlled substance for delivery to a location outside south Florida, and deliberately and consciously trying to avoid learning the specifics pertaining to the controlled substance, in order to be able to say if apprehended that she did not know what she would be transporting, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.

In other words, you may find that a defendant acted knowingly if you find beyond a reasonable doubt either, one, that the defendant actually knew that she was to transport and deliver controlled substances, or that she deliberately closed her eyes to what she had every reason to believe was the fact.

The jury verdict form provided a place for the jury to indicate whether it found Patterson guilty of Count One. If the jury found Patterson guilty of Count One, then a second section provided a place for the jury to mark whether it found her guilty of conspiring to possess with intent to distribute: (1) 1 kilogram or more of heroin; or (2) 100 grams or more of heroin. Similarly, if the jury found Patterson guilty of Count Five, then the jury had to indicate whether the offense involved: (1) 1 kilogram or more of heroin; or (2) 100 grams or more of heroin.

During deliberations, the jury submitted the following two questions to the court:

Why do we have a choice of the amount of the controlled substance on the verdict form? What do the 100 grams or more have to do with the case if the amount seized was 3 kilograms?

13

The district court informed the parties it would respond with the following answer:

> Three (3) kilograms is equal to 3000 grams.
>
> If you should find beyond reasonable doubt that the Defendant is guilty of either Count 1 or Count 5, or both, then you must also find the amount –
>
> that is:
>
> more than 1 kilogram
> more than 100 grams
>
> 3 kilograms is obviously more than either 1 kilogram or 100 grams.

Patterson requested that the court also instruct the jury that it needed to rely on the instructions already given, and she argued that by telling the jury that three kilograms equaled 3,000 grams, the court was bringing in extraneous information. The court responded that the proper answer to the jury's question was that the amounts were listed only because the jury's finding on drug amount was relevant for sentencing, but indicated it would not so inform the jury as to the use of drug amount at sentencing because that information was not relevant to the jury's factfinding. The district court overruled Patterson's objection and provided the above-quoted response to the jury.

The jury found Patterson guilty on both counts. On the verdict form, the jury indicated that it found the offenses involved "one kilogram or more," as

14

opposed to "100 grams or more," of heroin.  Patterson then proceeded to sentencing.

The Presentence Investigation Report ("PSI") recommended a base offense level of 34, pursuant to U.S.S.G. § 2D1.1(a)(3), because the offense involved 3.1 kilograms of heroin.  The PSI recommended no adjustments to the base offense level.  With a total offense level of 34, and a criminal history of I, Patterson faced a Guidelines range of 151 to 188 months' imprisonment.

In response to Patterson's objection to the PSI's failure to recommend a mitigating-role adjustment, pursuant to § 3B1.2(a), the probation officer noted that each of the co-defendants was equally culpable because they were all couriers in the conspiracy.  According to the PSI, co-defendants Rivera and Cepeda pled guilty to Counts 1 and 4 of the indictment and Rios pled guilty to Counts 1 and 5.  All three of Paterson's co-defendants received 48-month terms of imprisonment.

At the sentencing hearing, Patterson argued she was entitled to a minor-role adjustment because she was called at the last minute to help Rios drive, and she and Rios were going to receive only $1,500, while Rivera and Cepeda were supposed to split $10,000.  The district court found that Patterson had failed to prove by a preponderance of the evidence that she was entitled to a mitigating-role reduction because all of the participants were equally culpable.

15

After the court said it had considered the parties' arguments, the PSI, and the statutory factors under 18 U.S.C. § 3553(a), it found that a sentence at the low end of the Guidelines range was sufficiently punitive and would deter Patterson and others from committing similar crimes. The court sentenced Patterson to two concurrent 151-month terms of imprisonment. This appeal followed.

### III.

First, Patterson argues that the district court reversibly erred by including in its charge to the jury an instruction on deliberate indifference. We have held that "[a] deliberate ignorance instruction is appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." United States v. Perez-Tosta, 36 F.3d 1552, 1564 (11th Cir. 1994) (internal quotations and citation omitted). Such an inference can be supported by either direct or circumstantial evidence. United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993). Although the instruction is not appropriate when the "relevant evidence points only to actual knowledge, rather than deliberate avoidance," see Perez-Tosta, 36 F.3d at 1564-65 (quotation omitted), the instruction is properly given if the evidence supports both actual knowledge and deliberate ignorance. Arias, 984 F.2d at 1143.

16

Here, we readily conclude the district court did not err by giving the deliberate avoidance instruction because the evidence squarely pointed towards both actual knowledge and deliberate avoidance. Patterson's primary theory of defense was that she was ignorant of the purpose not only of the road-trip to New York in December 2005, but also of the multiple cruises she took with Rios as well as the first road-trip to New York, in April 2005. However, the government presented extensive evidence to the contrary, most notably during Rios's testimony about Patterson's direct knowledge of the drug-smuggling purpose of their cruises and road-trips. Even if the jury discounted Rios's testimony, it surely could have found Patterson was aware of a high probability that the purpose of the trip was to deliver drugs, and she purposely contrived to avoid learning about the trip's details in order to have a defense to criminal prosecution. Cf. Perez-Tosta, 36 F.3d at 1564. Even by Patterson's own account, she was asked to rent a car and drive codefendant Rios and a stranger hundreds of miles to New York with little more than a day's notice. As for her other trips with Rios, Patterson testified that she was never present when drugs were discussed or exchanged. Indeed, she testified that Rios never mentioned drug smuggling to her. On this record, the jury could have found that Paterson had attempted to avoid learning the details of the scheme,

particularly in light of her own testimony that she was never present when drugs were discussed or transferred.[1]

## IV.

Patterson also challenges the district court's answer to the jury's questions concerning whether it had a choice as to "the amount of the controlled substance on the verdict form" and whether the 100 grams was relevant to the case if the amount seized was 3 kilograms. Again, the district court's response was this:

> Three (3) kilograms is equal to 3000 grams.
> If you should find beyond reasonable doubt that the Defendant is guilty of either Count 1 or Count 5, or both, then you must also find the amount –
>
> that is:
>
> more than 1 kilogram
> more than 100 grams
>
> 3 kilograms is obviously more than either 1 kilogram or 100 grams.

On appeal, Patterson argues that because the jury was still deliberating over the weight of the drugs when it submitted the questions, and it had not indicated that it was considering holding Patterson accountable for 3 kilograms

---

[1]Moreover, even if the district court erred by instructing the jury on deliberate avoidance, the error was harmless beyond a reasonable doubt because Rios's testimony provided strong evidence that Patterson had actual knowledge that the purpose of the trip was to transport heroin. United States v. Schlei, 122 F.3d 944, 973 (11th Cir. 1997) (holding that if a district court gives an erroneous instruction on deliberate ignorance, but there is also strong evidence of actual knowledge of the crime being committed, any error will be deemed harmless).

of heroin, the district court's answer to the question constituted reversible error because it assumed the jury had found Patterson guilty. We disagree. Simply put, the district court's response did not assume that the jury was going to find Patterson guilty, and it did not improperly suggest a finding regarding the amount of drugs because: (1) it is undisputable that 3 kilograms is more than 1 kilogram or 100 grams; and (2) the jury's question stated that the crime involved the seizure of 3 kilograms of heroin. Moreover, even if the district court did err in its response, it did not commit plain error because the only genuine issue in dispute was Patterson's knowledge. At no point did Patterson assert a defense based on, or otherwise challenge, the amount of heroin involved in the offense. On this record, she cannot establish error, let alone plain error, based on the district court's answer to the jury.

## V.

Finally, Patterson argues that she was entitled to a minor-role reduction, pursuant to U.S.S.G. § 3B1.1, because: (1) she only participated in the conspiracy to transport the drugs for a brief period; (2) she was the least culpable of the individuals involved; and (3) she did not have any understanding or knowledge of the criminal enterprise. Again, we review a district court's factual determination regarding whether a defendant is eligible

for a reduction for role in the offense for clear error. United States v. De Varon, 175 F.3d 930, 934 (11th Cir. 1999) (en banc). We have noted that "a trial court's choice between 'two permissible views of the evidence' is the very essence of the clear error standard of review." Id. at 939. We will not find clear error unless we are "left with a definite and firm conviction that a mistake has been committed." United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005) (quotation marks and citation omitted).

In determining a defendant's role in an offense, a district court (1) must consider the defendant's role in the relevant conduct for which he has been held accountable at sentencing, and (2) may also consider his role as compared to that of other participants in his relevant conduct. De Varon, 175 F.3d at 940, 944. The proponent of a role adjustment bears the burden of establishing his role in the offense by a preponderance of the evidence. Id. at 934.

Here, Patterson was held accountable for only 3.1 kilograms of heroin, which was the amount that she and her codefendants were attempting to transport when they were arrested at the Miami hotel in December 2005. Patterson's role in the transportation of those drugs from Florida to New York was integral to the criminal enterprise because Rios did not have a credit card or any other means to pay for the transportation, and, according to Rios's

testimony, she would not have been able to transport the drugs to New York if Patterson had not agreed to rent the car and drive. Although Patterson contends that she was less culpable than the other codefendants, the record does not compel this conclusion, especially considering that there would have been no transportation for the drugs from Miami to New York without her participation.[2] Accordingly, the district court did not clearly err by denying her request for a minor-role reduction.

**AFFIRMED.**

---

[2]We are unpersuaded by Patterson's challenge to the reasonableness of her sentence. She suggests that her sentence of 151 months was unreasonably longer than her co-defendants' 48-month sentences. "After the district court has accurately calculated the Guideline range," we review the final sentence for reasonableness. United States v. Winingear, 422 F.3d 1241, 1244 (11th Cir. 2005). The factors that act as a guide in determining whether a sentence was reasonable are found in 18 U.S.C. § 3553(a). Id. at 1246. One of these factors is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). We have held that the "[d]isparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal." United States v. Regueiro, 240 F.3d 1321, 1325-26 (11th Cir. 2001). Also, "when the district court considers the factors of § 3553(a), it need not discuss each of them . . . an acknowledgment by the district court that it has considered the defendant's argument and the factors in § 3553(a) is sufficient." United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005).

Here, the disparity between Patterson's sentence and that of her three codefendants' is easily explained because her codefendants cooperated with agents during the investigation and accepted responsibility for their actions, while Patterson took no responsibility for her actions, and maintained that she was innocent throughout a jury trial. Moreover, the district court stated that it had considered the parties' arguments and the 18 U.S.C. § 3553(a) factors. On this record, Patterson's sentence, which was at the low end of the advisory Guideline range, was reasonable.